2002-NMSC-018

48 P.3d 50

Navor TERCERO, Plaintiff–Respondent,

v.

ROMAN CATHOLIC DIOCESE
OF NORWICH, Connecticut,
Defendant–Petitioner,

and

Roman Catholic Church of the Archdiocese of Santa Fe, a New Mexico Corporation, Servants of the Paraclete, f/k/a Via Coeli, Father Barney Bissonnette, and the Estate of John McCarthy, M.D., Defendants.

No. 25,618.

Supreme Court of New Mexico.

May 23, 2002.

Rehearing Denied June 12, 2002.

Beall & Biehler, P.A., Lisa P. Ford, Albu-
querque, NM, for Petitioner.

Law Office of Daymon Ely, Daymon B. Ely, Albuquerque, NM, for Respondent.

**OPINION**

MAES, Justice.

{1} This appeal involves the alleged sexual molestation of then school boy Plaintiff–Respondent, Tercero, by Father Bissonnette (Bissonnette) between 1966–68, while he was a priest at the Santa Fe Archdiocese. The issue presented on appeal is whether the district court in New Mexico has long-arm jurisdiction over Defendant–Petitioner, the Diocese of Norwich, Connecticut, (the Diocese) in the resulting lawsuit. The trial court dismissed Tercero's claims against the Diocese based on a lack of jurisdiction, and the Court of Appeals reversed. We reverse, concluding there was no long-arm jurisdiction over the Diocese.

**FACTS**

{2} Bissonnette was ordained as a priest and incardinated into the Diocese in 1958. In 1963, after reports of inappropriate conduct with boys, the Bishop of Norwich suspended Bissonnette "a divinis," meaning that he could not perform sacraments. Thereafter, the Diocese sent Bissonnette to the Via Coeli Center (Via Coeli or the Center), also known as the Servants of the Paraclete, in New Mexico, for counseling and therapy for pedophilia. The Diocese paid for Bissonnette's transportation to New Mexico, as well as for his treatment and room and board at Via Coeli. In May 1963, the Bishop wrote to the Center delegating it the authority to remove the suspension when it felt it was proper. However, in September 1963, based on a request from the Center, the Bishop lifted Bissonnette's suspension.

{3} Bissonnette returned to Connecticut in 1964 where he was told by the Bishop that he could never again function as a priest for the Diocese. Although not formally excardinated from the Diocese, Bissonnette was dismissed by the Diocese and given his "walking papers," as he referred to them. The Bishop later communicated to the Center and Bissonnette his recommendation that Bissonnette seek a benevolent bishop for whom he could work, but that the Bishop could not, in good conscience, provide Bissonnette with a recommendation. Thereafter, Bissonnette decided by himself to return to New Mexico from Connecticut. Paying his own transportation costs, Bissonnette returned to Via Coeli and then was transferred by the Center to one of its facilities in Minnesota. While in Minnesota, Bissonnette was given an assignment within the Diocese of Duluth. The Connecticut Diocese continued to pay for Bissonnette's stays at the Via Coeli facilities, both in New Mexico and Minnesota. The Roman Catholic Church of the Archdiocese of Santa Fe, The Servants of the Paraclete, and Father Bissonnette are also named defendants in the action; however, these additional defendants are not parties to this appeal.

{4} In early 1966, Bissonnette wrote to the Bishop seeking permission to return to New Mexico. The Bishop agreed with his request, provided Via Coeli was willing to accept him back. Upon his return, Bissonnette met with the Archbishop of Santa Fe, who assigned him to St. Anne's Parish in New Mexico. There, he eventually planned to apply for incardination into the Archdiocese of Santa Fe. He performed the assignment until 1968, when he was dismissed by that archdiocese for sexual molestation. Following his dismissal, Bissonnette returned to the Via Coeli Center in New Mexico where he again underwent treatment paid for by the Diocese.

**STANDARD OF REVIEW**

{5} Challenges made to a plaintiff's assertion of personal jurisdiction must be decided solely upon the facts of each individual case. *See Doe v. Roman Catholic Diocese of Boise, Inc.,* 121 N.M. 738, 743, 918 P.2d 17, 22 (Ct.App.1996). "[T]o the extent that a district court's conclusions concerning whether a plaintiff has proven personal jurisdiction rest on legal precepts, those conclusions are reviewed on appeal de novo.... On the other hand, a district court's conclusions based upon findings of fact are not disturbed on appeal unless clearly erroneous." *Campos Enters., Inc. v. Edwin K. Williams & Co.,* 1998-NMCA-131, ¶ 5, 125 N.M. 691, 964 P.2d 855 (citing *Mylan Labs., Inc. v. Akzo, N.V.,* 2 F.3d 56, 60 (4th Cir.1993)). In this

case, the record reveals that the district court failed to make findings of fact. Therefore, we conduct a de novo review on the issue of the existence of personal jurisdiction under the facts of this appeal. Where, as here, a timely challenge is raised under Rule 1–012(B)(2) NMRA 2002 contesting personal jurisdiction, the party asserting such jurisdiction has the burden of establishing that fact. *Smith v. Halliburton Co.*, 118 N.M. 179, 185, 879 P.2d 1198, 1204 (Ct.App.1994).

## ANALYSIS

▆ {6} Utilizing New Mexico's long-arm statute, our courts may exercise personal jurisdiction over non-residents. *See* NMSA 1978, § 38–1–16 (1971). That statute provides, in pertinent part:

A. Any person, whether or not a citizen or resident of this state, who in person or through an agent does any of the acts enumerated in this subsection thereby submits himself or his personal representative to the jurisdiction of the courts of this state as to any cause of action arising from:

(1) the transaction of any business within this state;

. . .

(3) the commission of a tortious act within this state.

This statute extends the jurisdictional reach of New Mexico courts as far as constitutionally permissible. *See United Nuclear Corp. v. Gen. Atomic Co.*, 91 N.M. 41, 42, 570 P.2d 305, 306 (1977). The Diocese challenges the district court's jurisdiction over it in the suit arising from Bissonnette's alleged molestation of Tercero while the priest was assigned to a parish in the Santa Fe Archdiocese.

▆ {7} Long-arm statutes have been held to be in derogation of the common law, hence, they must be strictly construed. *Worland v. Worland*, 89 N.M. 291, 295, 551 P.2d 981, 985 (1976). The constitutional standard requires that prior to a nonresident defendant being sued in a forum state, the defendant must have sufficient minimum contacts with the forum state so that permitting the action will not violate "traditional conception[s] of fair play and substantial justice."

*Int'l Shoe Co. v. Washington*, 326 U.S. 310, 320, 66 S.Ct. 154, 90 L.Ed. 95 (1945). A defendant will be found to have sufficient minimum contacts, satisfying due process, where the defendant has a connection with the forum state and has acted in the state in such a manner that they "should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). "[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State." *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). As noted in *Tarango v. Pastrana*, 94 N.M. 727, 728, 616 P.2d 440, 441 (Ct.App.1980), "[t]he question of personal jurisdiction over out-of-state residents involves more than a technical 'transaction of any business' or the technical 'commission of a tortious act' within New Mexico. The meaning of those terms, in our statute, is to be equated with the minimum contacts sufficient to satisfy due process."

▆ {8} In determining whether personal jurisdiction exists over the out-of-state Diocese, we apply the following three-part test to the specific facts of the case: (1) Did the Diocese commit an act or omission specifically set forth in the long-arm statute; (2) Does Tercero's cause of action arise out of the alleged acts or omissions; and (3) Has the Diocese established sufficient minimum contacts with New Mexico to satisfy due process concerns? *See Fed. Deposit Ins. Corp. v. Hiatt*, 117 N.M. 461, 463, 872 P.2d 879, 881 (1994); *Sanchez v. Church of Scientology of Orange County*, 115 N.M. 660, 663, 857 P.2d 771, 774 (1993). In applying this test, the analysis of whether the Diocese transacted business or committed a tortious act within New Mexico merges with the inquiry regarding whether such activities constitute minimum contacts sufficient to satisfy due process concerns. *See, e.g., Telephonic, Inc. v. Rosenblum*, 88 N.M. 532, 534, 543 P.2d 825, 827 (1975) ("We have repeatedly equated the 'transaction of business' . . . with the due process standard of 'minimum contacts' . . . . ."); *Tarango*, 94 N.M. at 728, 616 P.2d at 441 (meaning of terms "transaction of

any business" and "commission of a tortious act" to be equated with minimum contacts sufficient to satisfy due process).

{9} We note that any actions by the Diocese after the alleged abuse of Tercero, such as paying for Bissonnette's additional stay and treatment at Via Coeli, does not impact our analysis of whether long-arm jurisdiction can properly be established. *See Doe*, 121 N.M. at 744, 918 P.2d at 23 ("As a general rule, the existence of personal jurisdiction may not be established by events which have occurred after the acts which gave rise to Plaintiff's claims." (citing *Steel v. United States*, 813 F.2d 1545, 1549 (9th Cir. 1987)). Accordingly, those matters are not considered in the Court's analysis.

### Transaction of Business

{10} "Transaction of any business" under the long-arm statute has been defined as, " 'doing a series of similar acts for the purpose of thereby realizing pecuniary benefit, or otherwise accomplishing an object, or doing a single act for such purpose with the intention of thereby initiating a series of such acts.' " *Telephonic*, 88 N.M. at 534, 543 P.2d at 827 (quoting *Restatement (Second) of Conflict of Laws* § 35 cmt. a at 142 (1971)). Whether the Diocese purposely availed itself of the privilege of conducting business within New Mexico involves the determination of whether the activities in question amount to a purposeful act by it to participate in the forum state and avail itself of the benefits and protections of our laws. *See Hiatt*, 117 N.M. at 464, 872 P.2d at 882. Precedent exists in New Mexico establishing that the "transaction of any business" element of the long-arm provision is sufficient to fulfill the due process standard of minimum contacts. *State Farm Mut. Ins. Co. v. Conyers*, 109 N.M. 243, 245, 784 P.2d 986, 988 (1989). However, "this is true only if the cause of action arises from the particular transaction of business, and the minimum contacts were purposefully initiated by the defendant." *Id.* (citing *Customwood Mfg., Inc. v. Downey Constr. Co.*, 102 N.M. 56, 57, 691 P.2d 57, 58 (1984)). The Diocese's status as a religious non-profit organization has no impact on the inquiry of whether it transacted business within New Mexico for purposes of determining jurisdiction under our long-arm statute. *See Benally ex rel. Benally v. Amon Carter Museum of W. Art*, 858 F.2d 618, 622–23 (10th Cir.1988) (stating that if a wrong results from purposeful, organized activity, it makes no difference whether that activity is of a commercial character, in terms of the state's interest in redressing the harm to its citizens).

{11} Tercero argues that he made a prima facie showing that the Diocese transacted business in New Mexico, thereby submitting itself to the jurisdiction of New Mexico's courts. He contends that the Diocese's activities in New Mexico consisted of more than simply paying for Bissonnette's stays and treatment at Via Coeli and corresponding with the Center and Bissonnette. *See Diamond A Cattle Co. v. Broadbent*, 84 N.M. 469, 471, 505 P.2d 64, 66 (1973) (holding that where defendant mailed three payments into the state, there was barely any transaction of business, if any at all, and there were not the requisite minimum contacts to satisfy due process requirements); *Fox v. Fox*, 103 N.M. 155, 156–57, 703 P.2d 932, 933–34 (Ct.App. 1985) (holding that the sole activity of supporting minor children within the state did not fall within any provision of the long-arm statute, nor constitute minimum contacts sufficient to subject nonresident parent to the jurisdiction of New Mexico courts). Rather, Tercero argues that the Diocese formed an agency relationship with Via Coeli since the Center allegedly treated Bissonnette on the Diocese's behalf and, pursuant to its direction, allowed Bissonnette and the Center to locate a benevolent bishop to provide the priest with a parish assignment. He further argues that the Diocese granted the Center agency powers over Bissonnette and yet still controlled Bissonnette as a result of canon law principles.

{12} "An agent is a person who, by agreement with another called the principal, represents the principal in dealings with third persons or transacts some other business, manages some affair or does some service for the principal, with or without compensation." UJI 13–401 NMRA 2002. The authority of an agent may be actual or appar-

ent. "To establish apparent authority, the relying party must base the relationship upon words or acts of the principal, and not the representations or acts of the agent." *Damian Servs. Corp. v. PLC Servs., Inc.*, 763 F.Supp. 369, 372–73 (N.D.Ill.1991); *see also Diversified Dev. & Inv. v. Heil*, 119 N.M. 290, 296, 889 P.2d 1212, 1218 (1995) ("Apparent authority arises from manifestations by the principal to the third party."). Whether an agency exists is a question of fact to be determined from the circumstances of each case. *Brown v. Cooley*, 56 N.M. 630, 635, 247 P.2d 868, 871 (1952).

{13} For purposes of analyzing the establishment long-arm jurisdiction, if any agency relationship existed between the Diocese and Via Coeli, it was only during Bissonnette's initial stay at the Center, beginning in 1963. Bissonnette initially entered the Center as a result of the Diocese's decision to send him there for treatment. Necessarily, the Diocese allowed the Center to exercise control over Bissonnette, given his status as a client, or patient, seeking treatment and counseling. Furthermore, the Diocese did provide the Center the authority to determine when to lift the priest's suspension, which the Center recommended four months into Bissonnette's initial stay.

{14} However, the process of ending this agency relationship began when the suspension was lifted in September 1963, and the relationship was terminated in early 1964 when the Diocese informed Bissonnette that he would never again serve there. From late September 1963 and early 1964 to the time he left the Center for an assignment with the Archdiocese of Santa Fe, the contacts between the Diocese and Via Coeli amounted mostly to assuring that expenses were covered and some correspondence. Despite the fact that Bissonnette was actually never excardinated from the the Diocese, he had no chance of ever returning there for religious duty in the future, having been explicitly told that by the Bishop. Therefore, the services of Via Coeli, from that point forward, cannot reasonably be said to have been for the benefit of the Diocese or performed as its representative. *See generally Madsen*, 1999–NMSC–042, ¶ 8, 128 N.M. 255, 992 P.2d

268 (definition of "agent"); *Telephonic*, 88 N.M. at 534, 543 P.2d at 827 (definition of "transaction of business"). Rather, the services were exclusively for the personal health of Bissonnette, although this may have affected his ability to continue in his chosen profession.

{15} Moreover, Bissonnette's alleged misconduct, which gave rise to Tercero's cause of action, cannot reasonably be said to have resulted from the Diocese's transaction of business with Via Coeli, approximately 2 to 3 years before the alleged abuse occurred. *See generally Conyers*, 109 N.M. at 245, 784 P.2d at 988 (transaction of business can be sufficient to establish due process standard of minimum contacts if cause of action arises from the particular transaction of business). On the contrary, it is reasonable to conclude that the alleged abuse ultimately resulted from the decision of the Archdiocese of Santa Fe to hire Bissonnette and entrust him with a parish assignment, despite its knowledge of his past predilections. This was a decision which the Diocese determined years before it would never make again when it emphatically stated that he would never be able to serve there again.

{16} For purposes of establishing long-arm jurisdiction, the quality of contacts between the Diocese, Bissonnette, and the Center, following the priest's initial few months at the Center, were such that New Mexico's exercise of personal jurisdiction over the Diocese would be inconsistent with constitutional considerations of due process. As early as December 1963, the Diocese communicated to both Bissonnette and Via Coeli that it would not give the priest an assignment or accept him back in its parishes. As previously noted, Bissonnette was dismissed entirely from the Diocese in early 1964, for all intents and purposes, given that he could never serve there again. Moreover, in 1964, the Diocese informed Bissonnette that he should seek a "benevolent bishop" for whom he could work and, thereafter, seek incardination into that diocese. The Diocese never directed Via Coeli to find a "benevolent bishop" for Bissonnette. Nor is there any indication in the record that the Diocese directed, either implicitly or explicitly, that Bisson-

nette look within New Mexico for such a bishop. We believe that "encouraging" the priest to find a benevolent bishop is not the same thing, *see* Dissenting, infra ¶ 34, and it is important to note that this issue arose and was concluded in 1963, even before Bissonnette left for Minnesota and returned to Via Coeli on his own after his assignment there. Additionally, the Center alone made the determination to transfer Bissonnette to its Minnesota location. When the priest returned to Via Coeli, it was of his own decision and with his own money to cover transportation expenses.

{17} It is also critical to note that during the actual time period the alleged abuse took place, 1966 to 1968, the Diocese had little, if any, connection to, participation with, or control over Bissonnette and the Center. Rather, at the time of the alleged abuse, Bissonnette was under the direct control of the Archdiocese of Santa Fe, which had given him the parish assignment. Furthermore, at that time, the Diocese was not involved in communications or decisions with Via Coeli regarding Bissonnette since he was no longer at the facility, having left in 1965. Clearly, by the time Bissonnette became a parish priest for the Archdiocese of Santa Fe, the Diocese was no longer sufficiently conducting business in New Mexico for purposes of establishing jurisdiction.

{18} We recognize that, in the case at hand, the Diocese's involvement with Bissonnette and Via Coeli is greater than that dealt with in *Doe*, supra. In that case, the abusive priest had been ordained and incardinated in an out-of-state diocese but left that diocese, with its permission, to seek assignment elsewhere. The Court of Appeals decided that the plaintiff had failed to make a prima facie showing that the out-of-state diocese had purposely initiated any activity in New Mexico in order to establish long-arm jurisdiction. *Doe*, 121 N.M. at 743, 918 P.2d at 22. In contrast, in the case at hand, the Diocese purposely sent Bissonnette to Via Coeli for his initial stay. However, aside from its initial participation in Bissonnette's stay at the Center and its payment of expenses, the closer in time to the years the alleged abuse occurred, the significantly lesser the degree

of purposeful initiation of activity in New Mexico by the Diocese. Most importantly, during the actual time frame in which the alleged abuse occurred, the purposeful initiation of relevant activity by the Diocese was virtually nonexistent.

{19} Based on the above, we conclude that the Diocese was not transacting business in New Mexico at, or near, the time of the alleged acts giving rise to the suit, sufficient to exercise long-arm jurisdiction consistent with constitutional considerations of due process. We hold as a matter of law that the passage of time vitiated any causal link between any activity on the part of the Diocese in New Mexico and the injury to the plaintiff Tercero. Rather, the quality of contacts between the Diocese, Bissonnette, and the Center, following the priest's initial few months at the Center, were such that New Mexico's exercise of personal jurisdiction over the Diocese would offend traditional notions of due process involved in the application of long-arm jurisdiction.

**Tortious Act**

{20} When negligent acts occur outside New Mexico which cause injury within the state, a "tortious act" has been committed for purposes of the long-arm statute. *Roberts v. Piper Aircraft Corp.*, 100 N.M. 363, 366, 670 P.2d 974, 977 (Ct.App.1983). As with the transaction of business analysis, "[r]ather than engage in a technical analysis of whether [the defendant] committed a tortious act, we must equate the 'tortious act' which [the defendant] is alleged to have committed with minimum contacts to determine if due process has been satisfied." *DeVenzeio v. Rucker, Clarkson & McCashin*, 1996–NMCA–064, ¶ 10, 121 N.M. 807, 918 P.2d 723 (citing *Visarraga v. Gates Rubber Co.*, 104 N.M. 143, 146, 717 P.2d 596, 599 (Ct.App. 1986)). Tercero argues he made a prima facie showing that the Diocese committed a tortious act in New Mexico by virtue of its failure to supervise Bissonnette, while it allegedly maintained responsibility and control over him, by its failure to warn parishioners in New Mexico of Bissonnette's deviant tendencies, and through the failure of its agent, Via Coeli, to adequately supervise the priest.

**320**

{21} In order to conclude that the out-of-state Diocese is responsible for negligently supervising Bissonnette while he was in New Mexico, we must determine whether either a principal/agent or employer/employee relationship existed between them. Fundamentally, the liability of a principal for the tortious act of an agent is the same as the liability of an employer for the tortious act of an employee. Such liability is grounded on the maxim "respondeat superior," and is to be determined "by considering, from a factual standpoint, the question whether the tortious act was done while the employee ... was acting within the scope of employment." 3 AmJur 2d Agency § 280 (1986); *see also McCauley v. Ray*, 80 N.M. 171, 180–81, 453 P.2d 192, 201–02 (1968) (stating that it is the law in New Mexico that an employer is liable for intentional torts of his employee if the torts are committed in the course and scope of the employment). Generally, the employer/employee relationship is encompassed within the broader principal/agent relationship, as defined in *Madsen*, 1999–NMSC–042, ¶ 8, 128 N.M. 255, 992 P.2d 268.

{22} In slight distinction to a principal/agent relationship, *see id.*, "[a]n employer is one who has another perform certain work and who has the right to control the manner in which the details of the work are to be done, even though the right of control may not be exercised." UJI 13–403 NMRA 2002. The primary test to determine whether an employer-employee relationship exists is whether the employer has the right to control the details of the work of the employee. *Savinsky v. Bromley Group, Ltd.*, 106 N.M. 175, 176, 740 P.2d 1159, 1160 (Ct.App.1987). The secondary tests of the employer-employee relationship include: 1) direct evidence of the employer's right to control the manner and means of employee's performance; 2) the method of payment of compensation; 3) whether the employer furnishes equipment; and 4) the employer's right to end the relationship. *Id.*

{23} The record fails to reveal either a principal/agent or employer/employee relationship, between the Diocese and Bissonnette, such that it can reasonably be said that the alleged abuse occurred as a result of the former's inadequate supervision of the latter. From the onset of Bissonnette's arrival at Via Coeli, he was there as a patient, or client, and not as an agent of the Diocese. At the time the alleged abuse occurred years later, the Diocese exercised no control over Bissonnette. His parish assignment and compensation were both provided exclusively by his employer, the Archdiocese of Santa Fe, which also bore responsibility for providing any needed supervision, authority or directives. There is no indication in the record that the Diocese controlled, or even could control, any of the details of Bissonnette's work with the Archdiocese. Moreover and obviously, while the alleged abuse apparently resulted in the course of Bissonnette's employment, it was never within the scope of that employment. *See generally Moses v. Diocese of Colorado*, 863 P.2d 310, 330 (Colo. 1993) (en banc) (holding that the sexual misconduct of a priest cannot be a part of a priest's duties, nor customary within the business of the church).

{24} True, Bissonnette had been incardinated into the Diocese and remained listed in that Diocese's directory, despite having been unequivocally fired from that organization months after his arrival at Via Coeli. However, the tort he allegedly committed clearly was not within the scope of that "form-over-substance" relationship, but rather within the course of his day-to-day employment with the Archdiocese of Santa Fe. *See Stevens v. Roman Catholic Bishop of Fresno*, 49 Cal.App.3d 877, 123 Cal.Rptr. 171, 176 (1975) (noting that Bishop of Fresno had the power to control priest incardinated in France, but temporarily assigned to Fresno, when priest was working with that diocese's parishioners). In light of the foregoing, Tercero has failed to make a prima facie showing that the Diocese committed a tortious act in New Mexico by virtue of its failure to supervise Bissonnette, while it allegedly maintained responsibility and control over him.

{25} We now turn to the question of whether the Diocese had a duty to warn New Mexican parishioners. As a general rule, an individual does not have a duty to control the acts of a third party in the absence of a duty

imposed by statute or recognized as a result of a special relationship that exists between a defendant and the tortfeasor. *See* Restatement (Second) of Conflict of Laws § 315 (1965). Therefore, if the Diocese bore any duty, the responsibility to warn New Mexican parishioners must be based on an agency relationship between the Diocese and Bissonnette. As discussed previously, there was no such relationship in the years preceding the alleged abuse and clearly not at the time of the alleged wrongful conduct. We believe it is clear from the record that at that time, the relationship of loyalty and obedience on the part of the priest, and provision for his livelihood and welfare on the part of the Diocese, was over.

{26} Next, Tercero argues long-arm jurisdiction can be exercised over the Diocese based on tortious conduct resulting from Via Coeli's alleged failure to adequately supervise Bissonnette. However, as we discussed in the prior analysis regarding transaction of business, any agency relationship which existed between the Diocese and Via Coeli did not last throughout Bissonnette's stay at the Center. The authority originally granted Via Coeli to decide whether and when the priest could practice again expired in 1963 when his suspension was lifted by the Diocese. After that, no authority from the Diocese was needed for the Center to so decide. Moreover, Tercero's cause of action did not arise from any agency relationship between the Diocese and Via Coeli, or the Center's supervision of the priest. *See* § 38–1–16. Rather, the cause of action arose directly from the decision of the Archdiocese of Santa Fe to entrust Bissonnette with a parish assignment, a decision that the Diocese long before informed the priest and Via Coeli it would never make again. Given that communication by the Diocese and its dismissal of Bissonnette, the Center was not acting as the Diocese's agent in any efforts it made to secure a parish assignment in New Mexico for the priest.

{27} Finally, we do not agree with Tercero that the principles of canon law impact our analysis such that a different conclusion is warranted in either the transaction of business or tortious conduct long-arm juris-

diction inquiries. Regardless of canon law provisions, it is the acts of the Diocese, not those of Bissonnette, that "must provide the basis for this state exercising personal jurisdiction over" the Diocese. *Doe*, 121 N.M. at 744, 918 P.2d at 23. Those actions reveal a clearly-stated decision by the Diocese to dismiss Bissonnette from its organization with the understanding that he could never serve in the Diocese again. These actions were taken early in Bissonnette's initial stay at Via Coeli. The later actions of the Diocese, both closer to the alleged instances of abuse and especially during the priest's employment with the Archdiocese of Santa Fe, reveal a lack of authority over Bissonnette and his duties and actions. Finally, the Diocese lacked any authority whatsoever to take action regarding the level of supervision Bissonnette received after being provided a parish assignment. Although canon law may have defined the ecclesiastical relationship between the Diocese and Bissonnette, for purposes of our analysis of the application of facts to applicable law, we necessarily must focus on the actions of the parties involved. *Id.* That analysis leads us to conclude that the quality of contacts between the Diocese, Bissonnette, and the Center, following the priest's initial few months at the Center, were such that New Mexico's exercise of personal jurisdiction over the Diocese would offend traditional notions of due process involved in the application of long-arm jurisdiction.

**CONCLUSION**

{28} We conclude that while there was some connection between the Diocese and New Mexico, Bissonnette clearly was not an agent of the Diocese at any time relevant to Tercero's cause of action. Aside from an agency relationship between the Diocese and Via Coeli early on in Bissonnette's initial stay at the Center, the Diocese was not transacting business with Via Coeli to the degree that due process considerations would not be offended if long-arm jurisdiction were exercised over the Diocese. In considering whether the Diocese committed a tortious act in New Mexico on which to base jurisdiction, we conclude that the Diocese did not fail to

adequately supervise Bissonnette at any time when he may have been under its control, and there was no failure on the part of the Diocese to warn New Mexico parishioners. Finally, on the issue of tortious conduct, we conclude that at no time relevant to Tercero's cause of action did Via Coeli fail to adequately supervise Bissonnette such that jurisdiction could properly be exercised over the Diocese. There being no basis for long-arm jurisdiction over the Diocese, we reverse.

{29} **IT IS SO ORDERED.**

WE CONCUR: PATRICIO M. SERNA, Chief Justice, GENE E. FRANCHINI, Justice, JOSEPH F. BACA, Justice (dissenting), and PAMELA B. MINZNER, Justice (dissenting).

MINZNER, Justice (dissenting).

{30} I respectfully dissent. In holding that the district court lacked personal jurisdiction over the Diocese of Norwich, I believe the majority has taken a more restrictive view of jurisdiction than our cases require on these facts. For the following reasons, I would affirm the Court of Appeals.

{31} Because both the "transaction of business" and "tortious activity" strands of long arm jurisdiction have been conflated with the due process inquiry in New Mexico, see Majority Opinion ¶¶ 7–8, I am not certain that we need to examine them separately from each other or the ultimate constitutional inquiry. To do so would seem contrary to the view of personal jurisdiction that we have taken in the past.

{32} For example, in our most recent case on this issue we noted that,

> Because we have interpreted the long-arm statute as extending our personal jurisdiction as far as constitutionally permissible, it is not necessary to determine whether the [defendant] transacted business within New Mexico in any technical sense. When the state courts have construed the state long-arm statute as being coextensive with the requirements of due process, "the usual two-step analysis collapses into a single search for the outer limits of what due process permits."

*Fed. Deposit Ins. Corp. v. Hiatt*, 117 N.M. 461, 463, 872 P.2d 879, 881 (1994) (citation omitted) (quoting *Forsythe v. Overmyer*, 576 F.2d 779, 782 (9th Cir.1978)). Under this view, the sole inquiry is what due process allows. Nevertheless, it may be helpful in conducting that inquiry to separate the Diocese of Norwich's contacts into categories, as the majority has done.

{33} The Court of Appeals listed the following acts as sufficient to conclude that the Diocese transacted business within New Mexico:

> (1) intentionally sending Father Bissonnette to Via Coeli, paying for his room, board, and other expenses associated with his stay at Via Coeli; (2) authorizing his privileges and punishment while he was in New Mexico; (3) monitoring his progress at Via Coeli; (4) making Father Fitzgerald the Diocese's agent for purposes of monitoring his period of suspension and lifting the disciplinary suspension at his discretion; and (5) using the Servants as intermediaries in obtaining work for him outside of Connecticut.

*Tercero v. Roman Catholic Diocese*, 1999–NMCA–052, ¶ 17, 127 N.M. 294, 980 P.2d 77. The evidence of these actions was sufficient to support jurisdiction on the basis of the Diocese's "transaction of any business within" New Mexico. NMSA 1978, § 38–1–16(A)(1) (1971).

{34} As noted by the Court of Appeals, the Diocese "us[ed] the Servants as intermediaries in obtaining work for [Father Bissonnette] outside of Connecticut." *Tercero*, 1999–NMCA–052, ¶ 17, 127 N.M. 294, 980 P.2d 77. In September of 1964, the Vicar General of the Diocese of Norwich informed Father Bissonnette by letter that he would never work in that diocese again. That letter also stated,

> Bishop Hines recommends that through your Superior, Father Fitzgerald [of Via Coeli], you seek a Benevolent Bishop for whom you could work a year or two. During this period, through your zeal for souls and great love for God, your adoptive bishop would become convinced that you are a definite asset to his diocese. After that,

your procedure would be to seek incardination in that diocese.

Father Bissonnette complied with this letter and, with Father Fitzgerald's permission, found a job in Santa Fe. The majority opinion notes that the Diocese never directed Via Coeli to find a Benevolent Bishop for Father Bissonnette. The Diocese, did, however, encourage Father Bissonnette to find a Benevolent Bishop "through [his] Superior, Father Fitzgerald." It was at this job that the alleged abuse took place. From this evidence, a reasonable jury could have concluded that the Diocese used Via Coeli as an agent to find work for Father Bissonnette—who was still a member of the Diocese of Norwich through the time of the alleged abuse—and this directly led to the cause of action asserted by Plaintiff. Given that we have equated the transaction of business with the due process standard of minimum contacts, I would conclude that the Diocese's actions were sufficient to say that it had transacted business in New Mexico.

{35} Even if there was a delay from the time the Diocese ceased transacting business in New Mexico to the time of the conduct that gave rise to this lawsuit, we need not hold that the cause of action did not "arise from" the transaction of business in New Mexico. *See* Majority Opinion ¶ 15. We have said that the cause of action arises from the transaction of business if it "lies in the wake" of the defendant's in-state activities. *State Farm Mut. Ins. Co. v. Conyers*, 109 N.M. 243, 245, 784 P.2d 986, 988 (1989). The alleged abuse by Father Bissonnette "lies in the wake" of the Diocese's actions, specifically in placing him in New Mexico and encouraging him to find a job outside of Connecticut through Via Coeli. A reasonable jury could conclude that there was a direct causal link between the Diocese's transaction of business with Via Coeli in New Mexico and Plaintiff's injury, despite the passage of time. I therefore conclude that Plaintiff made a prima facie case that the Diocese transacted business in New Mexico, and that this cause of action arose from that jurisdictional contact.

{36} The majority opinion does not appear to foreclose the conclusion that there was at one time an agency relationship between the Diocese and Via Coeli that could constitute transacting business on the part of the Diocese. The majority concludes, however, that any such relationship ended long before the alleged abuse occurred and thus cannot be the basis of jurisdiction. Majority Opinion ¶¶ 13–15. While this is one view of the evidence presented, and even a reasonable one, it is not the only permissible view a jury could take. Despite having been told that he would not work in Connecticut again, Father Bissonnette was still a member of that Diocese as late as 1968. From this fact, it is reasonable to conclude that Via Coeli continued to act for the benefit of the Diocese who, after all, continued to pay it for its services. I am persuaded that Plaintiff put forth enough evidence to make a prima facie case that the agency relationship led to the alleged abuse, and that as a result of the Diocese's repeated and purposeful contacts with Via Coeli and New Mexico, jurisdiction is statutorily and constitutionally appropriate.

{37} Alternatively, I conclude that the Diocese of Norwich engaged in tortious conduct in New Mexico for two separate reasons. First, I agree with the Court of Appeals when it concluded that there is sufficient evidence that the Diocese committed a tort in New Mexico on the basis of Via Coeli's alleged negligent supervision of Father Bissonnette. "Any person ... who in person *or through an agent* does any of the acts enumerated in this subsection thereby submits himself ... to the jurisdiction of the courts of this state ...." Section 38-1-16(A) (emphasis added). On the basis of the correspondence from Via Coeli and the Diocese of Norwich, and through the affidavit of Father Thomas P. Doyle, Plaintiff's expert on canon law and the Church hierarchy, a reasonable jury could have concluded that the Diocese appointed Via Coeli as its agent to determine when, and whether, Father Bissonnette could again practice as a priest. I agree with the Court of Appeals that, although the ultimate determination of the existence of an agency relationship for purposes of tort liability is to be left to the trier of fact, Plaintiff made a prima facie case that Via Coeli, acting as the Diocese's agent, was negligent in its supervision of Father Bissonnette, and that the Dio-

cese thereby submitted itself to the jurisdiction of New Mexico courts. *Tercero*, 1999–NMCA–052, ¶ 2, 127 N.M. 294, 980 P.2d 77.

{38} Second, I believe that we can attribute tortious activity to the Diocese based on its failure to control or monitor Father Bissonnette's activities or warn New Mexico parishioners of his propensities. The Court of Appeals opinion alluded to two cases from other jurisdictions that so held, but did not decide the jurisdictional question on that basis. *See id.* ¶ 25; *John Doe 1–22 v. Roman Catholic Bishop of Fall River*, 509 N.W.2d 598 (Minn.Ct.App.1993); *John Does 1–9 v. CompCare, Inc.*, 52 Wash.App. 688, 763 P.2d 1237 (1988). In each case an incardinating diocese sent a priest to a diocese in another state for treatment, paid for that treatment, communicated extensively with the priest and the treatment center, revoked the priest's ability to get a job within the incardinating diocese, and was informed of their new employment at which place each priest was alleged to have molested the plaintiffs. *CompCare*, 763 P.2d at 1239–41; *Fall River*, 509 N.W.2d at 599–600. In each case the forum court found that asserting jurisdiction over the incardinating diocese was consistent with their long-arm statutes, which are substantially similar to our own, and with due process.

{39} In *CompCare*, the court found jurisdiction over the incardinating diocese on the theory of its negligent supervision of the priest and its failure to warn the priest's subsequent employers. *CompCare*, 763 P.2d at 1241. The court rejected the argument that the priest's misconduct was beyond the scope of the employment relationship because it did not arise from priestly activities: "The Diocese's argument ignores the scope of the relationship which existed between the Diocese and its priest. The duty of obedience which [the priest] owed the Diocese encompassed all phases of his life and correspondingly the Diocese's authority over its cleric went beyond the customary employer/employee relationship." *Id.* at 1242 (citing *Code of Canon Law*, Canons 265, 273, 290, 1333, 1350, 1395 (1985)).

{40} The court in *Fall River* similarly found that plaintiffs had made a prima facie

case of tortious activity within the forum state on the theories of negligent supervision and failure to warn. The court held that the exercise of jurisdiction was appropriate because the diocese had sufficient minimum contacts with Minnesota:

In the context of products liability law, use of an intermediary and ignorance of the ultimate destination of a product does not shield a manufacturer from long-arm jurisdiction. Similarly, the Servants of the Holy Paraclete here are alleged to have acted at the behest of Fall River. Fall River's authorization of [the priest's] treatment at Via Coeli, acceptance of responsibility for his expenses, request to be informed of [his] progress, and grant of permission for [his] assignment to parish work, manifest an ongoing relationship between Fall River and [the priest], with Via Coeli acting as an intermediary.

*Fall River*, 509 N.W.2d at 601 (citation omitted). A subsequent case has described *Fall River* as applying a "stream-of-commerce theory" of personal jurisdiction to a foreign incardinating diocese. *Bergherr v. Sommer*, 523 N.W.2d 17, 20–21 (Minn.Ct.App.1994). That theory seems to me to be particularly appropriate in this case.

{41} I do not think that the "special relationship" that can be the premise of liability for failing to control Father Bissonnette or to warn New Mexico parishioners is limited to one of agency. *See* Majority Opinion ¶ 25. The majority opinion cites to the Restatement (Second) of Torts § 315 (1965) for the proposition that a special relationship is required to give rise to a duty to control the acts of a third person. The Comment on Clauses (a) and (b) to that section states, "The relations between the actor [here, Norwich] and a third person [here, Father Bissonnette] which require the actor to control the third person's conduct are stated in §§ 316–319." Nothing in this list of examples leads me to conclude that the relationship is limited to one of agency. Section 319 provides, as an example of that special relationship, "One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reason-

able care to control the third person to prevent him from doing such harm."

{42} Father Doyle's affidavit explains why, under canon law, the Diocese of Norwich has taken charge of Father Bissonnette. Based on the correspondence and actions of the Diocese, as they are explained by that affidavit, a jury could determine that the Diocese expected loyalty and obedience from the Father, and in return provided a lifelong guarantee that it would provide adequate means of livelihood and social welfare, whether or not that would be accomplished within the geographic boundaries of the Diocese. *See CompCare,* 763 P.2d at 1242. The correspondence between Father Bissonnette and the Diocese of Norwich shows the degree of control the latter did in fact exert over the former. Examples of this control included: allowing Father Bissonnette to return to New England to visit family, but preventing him from returning to Connecticut; granting him permission to recite the Divine Rite in English; granting him permission for a return to Via Coeli after his stay in Minnesota; and approving his expressed desire to seek incardination in the Archdiocese of Santa Fe. A jury could find from this evidence that the Diocese took charge of Father Bissonnette and thereby had a duty to control him, or at the very least to warn New Mexico parishioners about his propensities. I would therefore conclude, consistent with *CompCare* and *Fall River,* that Plaintiff made a prima facie case that the Diocese had failed in that duty and thereby committed a tortious act within the State of New Mexico.

{43} The majority concludes in ¶ 27, *supra,* that canon law does not impact the analysis and that it is the acts of the Diocese that must support jurisdiction. I agree that the Diocese's actions must support jurisdiction. For that determination, however, canon law and Father Doyle's affidavit about its effect help explain and give context to the Diocese's actions. For example, Father Doyle explains why the incardinating Diocese that fired a priest would still list him as one of its members and still assert control over him. This understanding of canon law would allow a trier of fact, perhaps impressed with the analogy to a typical employer-employee

relationship, to understand why the parties behaved as though the Diocese still exerted control over Father Bissonnette. The actions of the Diocese, as explained and contextualized by canon law and Father Doyle's expertise in that regard, do provide a basis for jurisdiction over it.

{44} Viewing these cumulative contacts as a whole, as I think our cases instruct us to do, it is within the "outer limits of what due process permits" to assert jurisdiction over the Diocese of Norwich. Our cases have described these outer limits by reference to cases from the United States Supreme Court. Thus, in *Hiatt* we noted that the minimum contacts with the forum required by due process must be significant enough that the assertion of jurisdiction over the out-of-state defendant would not offend "traditional notions of fair play and substantial justice." *Hiatt,* 117 N.M. at 463, 872 P.2d at 881 (quoting *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). That case also noted that "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Id.* at 464, 872 P.2d at 882 (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)). Finally, we emphasized that it is essential in each case "that [the defendant] should reasonably anticipate being haled into court there," *Id.* (quoting *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)), although we cautioned that " 'foreseeability' alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause." *Id.* (quoting *World–Wide Volkswagen,* 444 U.S. at 295, 100 S.Ct. 580).

{45} In this case Plaintiff put on evidence that the Diocese of Norwich incardinated a priest, and thus assumed a life-long duty to provide for him should he ever become destitute. Rather than allow that priest to cause more harm to parishioners in Connecticut, and rather than excardinate him or allow him to become destitute, the Diocese sent him to New Mexico for treatment and suspended

**326**

him *a divinis*. *See* Majority Opinion ¶ 2. The Diocese delegated to Via Coeli, the treatment center in New Mexico, the decision to lift the suspension. The Diocese paid for his stay and treatment in New Mexico. The Diocese maintained communication with Father Bissonnette and Via Coeli in New Mexico; our record contains several letters from the Diocese sent to New Mexico, monitoring Father Bissonnette's progress, making decisions concerning his day-to-day life, and deciding where his future would lie. The Diocese recommended that, rather than return to Connecticut where his past was well known, he seek employment elsewhere through his superior at Via Coeli. Under these facts, I conclude that the Diocese's contacts with New Mexico were substantial, that they were purposeful, and that the Diocese could reasonably foresee being haled into a New Mexico court on account of the dangerous instrumentality it sent to this state. I therefore conclude that it does not offend due process to assert jurisdiction over the Diocese.

{46} By way of comparison, we found jurisdiction to be constitutionally appropriate in *Kathrein v. Parkview Meadows, Inc.*, 102 N.M. 75, 691 P.2d 462 (1984), when the defendant, operating an alcoholism treatment center in Arizona, had advertised for two years in the yellow pages of an Albuquerque telephone directory, had solicited referrals from the Albuquerque chapter of the National Council on Alcoholism, mailed a brochure to the plaintiff, and encouraged her by telephone to attend a program at their center. The alleged harm took place at the center in Arizona. *Kathrein*, 102 N.M. at 76, 691 P.2d at 463. Similarly, in *Conyers* we held that jurisdiction was appropriate over a defendant in an insurance dispute arising from an automobile accident in Nevada, where the defendant had lived briefly in New Mexico three years prior to the accident, and had purchased insurance in New Mexico while living here. *Conyers*, 109 N.M. at 244, 784 P.2d at 987. In these two cases the foreign defendants' contacts to New Mexico were somewhat attenuated at the time of the alleged harm, and yet we found personal jurisdiction acceptable. These cases articulate a broad standard of due process; I am persuaded by them that it would not offend "traditional notions of fair play and substantial justice" to assert jurisdiction over the Diocese of Norwich.

{47} For the foregoing reasons, I respectfully dissent from the majority opinion. Our cases have conflated the constitutional due process standard with the relevant statutory standards. That due process standard is quite broad, and I conclude that it would allow New Mexico to assert personal jurisdiction over the Diocese of Norwich, either on the basis of the business transacted or tortious conduct within New Mexico. Assertion of jurisdiction over the Diocese seems consistent with our prior cases, and with virtually identical cases from other jurisdictions. I would therefore affirm the Court of Appeals.

I CONCUR: JOSEPH F. BACA, Justice.