This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

No. A-1-CA-38592

KATHLEEN WEBB, Wrongful Death
Personal Representative of the ESTATE
OF JACOLIN BLACKBURN, Deceased,

Plaintiff-Appellee,

v.

FIVE STAR MONTEBELLO, LLC d/b/a
MONTEBELLO ON ACADEMY,

Defendant-Appellant,

and

REHABILITATION PARTNERS, LLC;
UNIVERSITY OF NEW MEXICO HOSPITAL;
PRESBYTERIAN HEALTHCARE SERVICES;
and ENCOMPASS HEALTH REHABILITATION
HOSPITAL OF ALBUQUERQUE, LLC,

Defendants.

APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY
Erin B. O'Connell, District Judge

Will Ferguson & Associates
Jason A. Vigil
Albuquerque, NM

for Appellee

Quintairos, Prieto, Wood & Boyer, P.A.
Frank Alvarez
Dallas, TX

for Appellant

## MEMORANDUM OPINION

**BOGARDUS, Judge.**

**{1}** Five Star Montebello, LLC d/b/a Montebello on Academy (Defendant) appeals the district court's denial of Defendant's motion to compel arbitration, pursuant to NMSA 1978, Section 44-7A-29(a)(1) (2001). At issue are two arbitration agreements signed in connection with Jacolin Blackburn's (Resident's) two admissions to Defendant's assisted living facility, one of which was signed by Resident's daughter, Kathleen Webb (Daughter). Defendant argues the district court erred in concluding that the arbitration agreements were unenforceable because (1) both arbitration agreements are unambiguous; (2) Daughter had authority to execute the first agreement; and (3) there is no evidence Resident lacked capacity at the time she executed the second agreement. We affirm.

## BACKGROUND

**{2}** This case arises from a wrongful death and negligence suit concerning care Resident received at Defendant's assisted living facility (the Facility). Resident was first admitted to the Facility in December 2017, and Daughter signed an arbitration agreement on December 18, 2017 (December Agreement) on Resident's behalf. Resident was discharged on January 12, 2018, and readmitted to the Facility later that same day. Upon readmission, Resident signed an arbitration agreement (January Agreement). The provisions of the January Agreement were not identical to those of the December Agreement signed by Daughter.

**{3}** Daughter, as personal representative of Resident's estate, later filed suit for wrongful death and negligence. In response, Defendant moved to compel arbitration, arguing that both arbitration agreements were enforceable. The parties filed briefs to which they attached several exhibits, including Resident's medical records, Advanced Healthcare Directive (Healthcare Directive), and Power of Attorney (POA), and a deposition transcript of Resident's testimony in another matter.

**{4}** After briefing and argument, the district court entered an order denying Defendant's motion to compel arbitration. The district court determined the arbitration agreements were unenforceable as a matter of law on two bases: (1) The December Agreement and January Agreement had conflicting and inconsistent provisions, rendering them ambiguous; and (2) genuine issues of material fact as to Daughter's authority and Resident's capacity prevented the district court from finding that an enforceable arbitration agreement existed. Defendant appeals.

## DISCUSSION

**{5}** We address first Defendant's claim of error in the district court's rulings regarding Daughter's authority to sign the December Agreement on Resident's behalf, and Resident's capacity to sign the January Agreement. Given our conclusions on the

issues of capacity and authority, which preclude enforcement of the arbitration agreement, we do not reach or decide Defendant's claim that the terms of the arbitration agreements were clear and unambiguous, nor do we address Plaintiff's contention that the agreements were unconscionable. *See Sheraden v. Black*, 1988-NMCA-016, ¶ 10, 107 N.M. 76, 752 P.2d 791 ("It is well settled in New Mexico that the function of a reviewing court on appeal is to correct erroneous results, not to correct errors that, even if corrected, would not change the result.").

## I.      Standard of Review

**{6}**      "We apply a de novo standard of review to a district court's denial of a motion to compel arbitration." *Peavy v. Skilled Healthcare Grp., Inc.*, 2020-NMSC-010, ¶ 9, 470 P.3d 218 (internal quotation marks and citation omitted). "[A] motion to compel arbitration may only be granted as a matter of law when there is no genuine issue of material fact as to the existence of an agreement." *DeArmond v. Halliburton Energy Servs.*, 2003-NMCA-148, ¶ 4, 134 N.M. 630, 81 P.3d 573. "The district court, when considering a motion to compel arbitration which is opposed on the ground that no agreement to arbitrate had been made between the parties, should give to the opposing party the benefit of all reasonable doubts and inferences that may arise." *Id.* (internal quotation marks and citation omitted).

## II.      The District Court Did Not Err in Denying Defendant's Motion to Compel Arbitration

**{7}**      Defendant argues the district court erred in denying its motion to compel arbitration because (1) Daughter had authority to sign the December Agreement, and (2) there is no evidence Resident lacked capacity at the time she signed the January Agreement. We are unpersuaded.

**{8}**      "When a party agrees to a non-judicial forum for dispute resolution, the party should be held to that agreement." *Barron v. Evangelical Lutheran Good Samaritan Soc.*, 2011-NMCA-094, ¶ 14, 150 N.M. 669, 265 P.3d 720 (internal quotation marks and citation omitted). However, "New Mexico courts have clearly distinguished those situations where lack of agreement by the parties renders an arbitration clause unenforceable." *Id.* ¶ 15; *see also Heye v. Am. Golf Corp.*, 2003-NMCA-138, ¶ 8, 134 N.M. 558, 80 P.3d 495 (stating that a legally enforceable agreement to arbitrate is a prerequisite to arbitration and without such agreement, parties will not be forced to arbitrate). For this reason, "[t]he party attempting to compel arbitration carries the burden of demonstrating a valid arbitration agreement." *Corum v. Roswell Senior Living, LLC*, 2010-NMCA-105, ¶ 3, 149 N.M. 287, 248 P.3d 329. As relevant to this case, "a valid arbitration agreement signed by a competent party binds that party's estate and statutory heirs in a subsequent wrongful death action." *Estate of Krahmer ex rel. Peck v. Laurel Healthcare Providers, LLC*, 2014-NMCA-001, ¶ 1, 315 P.3d 298.

## A.      Defendant Failed to Establish Daughter's Agency and Authority

**{9}** Defendant argues the district court erred in denying its motion to compel arbitration because Daughter had actual or apparent authority to sign the December Agreement on behalf of Resident. Defendant contends Daughter had actual authority through Resident's Healthcare Directive and had "apparent authority by express or implied terms, words, or conduct." For the reasons that follow, we disagree.[1]

**{10}** Under principles of agency, an agent's agreement to a contract may bind the principal. *See MPC Ltd. v. N.M. Tax'n & Revenue Dep't*, 2003-NMCA-021, ¶ 30, 133 N.M. 217, 62 P.3d 308 (stating that, in an agency relationship, the agent has power to bind the principal in dealings with third parties). "Whether an agency exists is a question of fact to be determined from the circumstances of each case." *Tercero v. Roman Catholic Diocese of Norwich, Conn.*, 2002-NMSC-018, ¶ 12, 132 N.M. 312, 48 P.3d 50. The party asserting the existence of an agency relationship bears the burden of establishing such a relationship. *See Corona v. Corona*, 2014-NMCA-071, ¶ 22, 329 P.3d 701 (stating that a plaintiff seeking to impose liability on the principal for the acts of the agent bears the burden of demonstrating an agency relationship). In order to establish an agency relationship, the party must demonstrate "that the principal has in some manner indicated that the agent is to act for him[ or her], and that the agent so acts or agrees to act on his [or her] behalf and subject to his [or her] control." *Totah Drilling Co. v. Abraham*, 1958-NMSC-102, ¶ 19, 64 N.M. 380, 328 P.2d 1083.

**{11}** Once an agency relationship is established, "the principal is [ordinarily] liable for the acts of his [or her] agent when acting within the scope of the agent's authority." *Stewart v. Potter*, 1940-NMSC-052, ¶ 17, 44 N.M. 460, 104 P.2d 736. The authority of an agent may be: (1) actual, in that it "is given to the agent by the principal in terms that are express, or in terms that are implied from words or conduct of the principal to the agent or from the circumstances of the relationship[;]" or (2) apparent, in that it "arises from manifestations by the principal to the third party and can be created by appointing a person to a position that carries with it generally recognized duties." *Barron*, 2011-NMCA-094, ¶ 16 (internal quotation marks and citations omitted).

**{12}** Here, it is undisputed that Resident's Daughter signed the December Agreement. Thus, to prove a valid arbitration agreement sufficient to bind Resident's estate, Defendant bore the burden of demonstrating that Daughter had actual or apparent authority to sign the December Agreement as Resident's agent. *See Corona*, 2014-NMCA-071, ¶ 22.

**{13}** Defendant asserts Daughter possessed actual authority through Resident's Healthcare Directive. The Healthcare Directive provides that Daughter's authority to "make all health-care decisions" for Resident "becomes effective when [Resident's]

---

[1]Related to Defendant's argument that Daughter had actual authority through Resident's Healthcare Directive, Defendant contends this Healthcare Directive granted Daughter authority to make all healthcare decisions on Resident's behalf, which included the authority to complete admissions paperwork and thus execute the December Agreement. Given our conclusion that Daughter's authority under Resident's Healthcare Directive had not yet become effective as of the date Daughter signed the December Agreement, we need not address this argument. *See Sheraden*, 1988-NMCA-016, ¶ 10.

supervising health-care provider (as defined in Part 3 . . .) determines that [Resident is] unable to make [her] own health-care decisions." Part 3 of the Healthcare Directive, in turn, defines "supervising health-care provider" as: "[Resident's] primary physician or (if my primary physician is not willing, able or reasonably available to act as such) the health-care provider who undertakes primary responsibility for [Resident's] health care." "Health-care provider" is defined as "an individual licensed, certified or otherwise authorized or permitted by law to provide health care in the ordinary course of business or practice of a profession."

{14}    Defendant advances no argument that Resident's supervising health-care provider determined Resident was unable to make her own healthcare decisions. Thus, Defendant has not established as a matter of law that Daughter's authority to make healthcare decisions for Resident had become effective.

{15}    Further, more than two years before Daughter signed the December Agreement, Resident executed a general Power of Attorney (POA) appointing Zia Trust, Inc. (Zia) as Resident's "attorney-in-fact . . . regardless of whether or not [Resident is] incapacitated." While the POA did not revoke any durable powers of attorney for health care granted by Resident, the POA granted Zia several powers applicable to executing an arbitration agreement as part of admission to an assisted living facility. Specifically, the POA granted Zia the power to (1) "sign, endorse, [and] execute . . . such . . . contracts . . . and other instruments in writing of whatever kind and nature as may be necessary or proper in the exercise of the powers" granted by the POA; (2) "enter into a written agreement with an individual, entity or other person . . . [;]" (3) "engage in and actively transact any and all lawful business of whatever nature or kind for [Resident] and in [Resident's] name[;]" and (4) "exercise . . . any act, right, power . . . or obligation" relating to Resident's "residence, which [Resident is] then occupying as [Resident's] residential homestead[.]" Defendant does not argue Resident's POA is ineffective. The POA's terms thus indicate Zia would have had authority to sign an arbitration agreement on Resident's behalf.

{16}    Defendant argues the district court's finding that Daughter's authority was not yet effective is logically inconsistent. On one hand, Defendant contends, "the [district court] found the grant of authority to [Daughter] was ineffective because no healthcare provider deemed [Resident] unable to make her own healthcare decisions[;] but on the other hand, the [district court] found [Resident] suffered a head injury and cognitive defects and was unable to make her own decisions." Thus, argues Defendant, if Resident was cognitively impaired and could not make her own decisions, Daughter's authority under Resident's Healthcare Directive was effective.

{17}    This argument, however, fails to address the threshold requirement needed to effectuate Daughter's authority under Resident's Healthcare Directive: a determination by Resident's supervising health-care provider that Resident was unable to make her own healthcare decisions. We also observe, as did the district court, the logical inconsistency in Defendant's argument: Defendant asserts Daughter had authority under Resident's Healthcare Directive—which called for a determination that Resident

was unable to make her own healthcare decisions—yet maintains Resident had capacity to execute the January agreement.

**{18}** As to Defendant's argument that Daughter had "apparent authority by express or implied terms, words, or conduct[,]" Defendant develops no argument that Resident made manifestations to Defendant that Daughter had authority to sign the December Agreement. *See Barron*, 2011-NMCA-094, ¶ 16; *see also Tercero*, 2002-NMSC-018, ¶ 12 ("To establish apparent authority, the relying party must base the relationship upon words or acts of the principal, and not the representations or acts of the agent." (internal quotation marks and citation omitted)). Defendant argues, however, "there is evidence to show [Daughter] had authority to enter into the December [Agreement] despite the POA" held by Zia, pointing to Resident's deposition testimony in another matter seven months after Daughter signed the December Agreement. In that deposition, Defendant contends Resident "stated . . . [D]aughter had the right to make any decisions on [Resident's] behalf." Thus, Defendant asserts, "[Resident] knew [Daughter] had authority to make decisions for her and never objected to [Daughter] doing so, even though [Resident] had a POA by Zia[.]" In fact, Resident's deposition testimony indicates Resident was making her own healthcare decisions as of September 2017; Daughter helped with or made "finance" decisions for Resident; and Resident was unclear as to what, if any, authority Resident's POA granted Daughter. To the extent Defendant contends any failure by Resident to object to Daughter making decisions for her supported Daughter's authority to sign the December Agreement, it is settled law that a principal cannot ratify a purported agent's acts through mere inaction unless the principal has full knowledge of the material facts concerning the transaction. *See Tee Mining Corp. v. Nat'l Sales, Inc.*, 1966-NMSC-173, ¶ 5, 76 N.M. 677, 417 P.2d 810 ("It is indispensable to ratification that the party held thereto shall have had full knowledge of all the material facts concerning the transaction."). Defendant makes no argument Resident knew Daughter signed her December admission documents or the December Agreement. Accordingly, Defendant has not established that the district erred in finding that no agreement existed and that the arbitration agreement was unenforceable as a matter of law.

**B.** **The District Court Did Not Err in Determining the January Agreement Was Unenforceable Based on Resident's Capacity**

**{19}** Defendant also argues the district court erred in denying Defendant's motion to compel arbitration on the ground Resident lacked capacity to sign the January Agreement. Defendant contends there is no evidence Resident lacked capacity at the time she executed the January Agreement, and thus the presumption of Resident's capacity was not overcome. We determine that the district court did not err in denying Defendant's motion.

**{20}** "The test of mental capacity is whether a person is capable of understanding in a reasonable manner, the nature and effect of the act in which the person is engaged." *In re Estate of Head*, 1980-NMCA-096, ¶ 15, 94 N.M. 656, 615 P.2d 271. "The law presumes that every person is competent. To show the contrary, the burden of proof

rests on the person asserting lack of capacity to establish the same by clear and convincing proof." *Heights Realty, Ltd. v. Phillips*, 1988-NMSC-007, ¶ 5, 106 N.M. 692, 749 P.2d 77.

**{21}** "Although the test of mental capacity is applied as of the date that the attacked instrument is executed, evidence of a person's prior or subsequent condition is admissible to show the condition at the time in issue." *Id.* ¶ 6. "The combined weight of all the evidence in each case determines the result. The court is entitled to take into consideration the individual's physical condition; the adequacy of consideration; whether or not the transaction was improvident; the relation of trust and confidence between the parties to the transaction and the weakness of the mind of the alleged incompetent person as judged by all other acts within a reasonable time prior and subsequent to the act in question." *Id.*; *see id.* ¶¶ 9-10, 14, 16 (determining there was substantial evidence that the plaintiff lacked capacity to execute a contract in part based on family members' many observations of the plaintiff's mental capacity over a period of years before the date of execution).

**{22}** Here, looking to evidence regarding Resident's prior and subsequent condition to show her condition as of the date she signed the January Agreement—and viewing this evidence in the light most favorable to Daughter—we conclude that the district court did not err in determining that Resident's medical records near in time to her signing the arbitration agreement on January 12, 2018, reflect that Resident suffered from cognitive problems and confusion. *See id.* ¶ 6. On December 1, 2017, Resident sustained a "traumatic brain injury[.]" On December 31, 2017, Resident could not recall where she lived. On January 7, 2018, Resident required directions on how to contact her daughter. And on January 9, 2018, Resident demonstrated confusion about her living situation and reported she was unsure where she was living before being hospitalized. We also note that medical records indicate Resident had "chronic dementia" predating her signing the January Agreement.

**{23}** Similarly, in the days and weeks after January 12, 2018, medical records indicate Resident demonstrated below normal cognitive functioning. On January 16, 2018, a physician assessment noted Resident's diagnosis of an acute subdural hematoma and "moderate physical and cognitive limitations." On January 26, 2018, Resident scored below normal on a cognitive assessment test, and medical records from the Facility dated the same day assess Resident as exhibiting "marked" cognitive problem solving and short-term recall impairments; "moderate" cognitive safety-judgment and executive function impairments; and "marked" impairment of the ability to recall new information presented verbally.

**{24}** Defendant again argues that if Resident was so impaired as to lack capacity to make decisions, it follows that Daughter had authority to make decisions for Resident based on Resident's Healthcare Directive. This argument fails for the same reason discussed above. We conclude the district court did not err in determining that Defendant has not demonstrated the existence of an enforceable agreement as a

matter of law. *See DeArmond*, 2003-NMCA-148, ¶ 4. Accordingly, we conclude the district court properly denied Defendant's motion to compel arbitration.

**CONCLUSION**

**{25}** For the foregoing reasons, we affirm.

**{26}   IT IS SO ORDERED.**

**KRISTINA BOGARDUS, Judge**

**WE CONCUR:**

**MEGAN P. DUFFY, Judge**

**JANE B. YOHALEM, Judge**