2003-NMCA-021

62 P.3d 308

**MPC LTD., d/b/a Manpower of New Mexico, a New Mexico corporation, Plaintiff–Appellant,**

v.

**NEW MEXICO TAXATION AND REVENUE DEPARTMENT, and T. Glenn Ellington, Secretary of the New Mexico Taxation and Revenue Department, Defendants–Appellees.**

No. 22,158.

Court of Appeals of New Mexico.

Oct. 2, 2002.

Curtis W. Schwartz, Timothy R. Van Valen, Modrall, Sperling, Roehl, Harris & Sisk, P.A., Santa Fe, NM, for Appellant.

Patricia A. Madrid, Attorney General, Bridget Jacober, Special Assistant Attorney General, Santa Fe, NM, for Appellees.

## OPINION

SUTIN, Judge.

{1} MPC, Ltd. d/b/a Manpower of New Mexico (Manpower) appeals the district court's denial of a claim for refund of gross receipts tax assessed by the New Mexico Taxation and Revenue Department (the Department). Manpower asserted it was not liable for tax on its gross receipts (receipts) from clients to which it provided temporary staffing services. Employing statutory presumptions that receipts are taxable and the Department's assessment was correct, the district court held the receipts are taxable as reimbursements of payroll-related expenditures.

{2} Manpower contends the receipts are not subject to tax, pursuant to NMSA 1978, § 7-9-3(F)(2)(f) (2002), which excludes receipts received in a "disclosed agency capacity" from the definition of gross receipts. We hold the receipts are subject to tax and affirm the district court.

## BACKGROUND

{3} Manpower locates, recruits, tests, and trains prospective employees, and maintains "a data base that has a broad range of skilled applicants." Based on the job description or needs provided by a client, Manpower matches the skills required with those of the persons in its database and then assigns the prospective employee to the client for work.

{4} The majority of Manpower's business with its clients is done verbally. Of its estimated 350 New Mexico clients, Manpower has about five to seven written contracts, most of which are national contracts. The contracts do not mention any joint employer status or requirement that the client is obligated for payroll if Manpower does not pay. Some written contracts state that Manpower is an independent contractor. For example, Manpower's Unysis contract states that Manpower is an independent contractor and not an agent of Unisys and also states that Manpower is responsible for employment taxes, discipline, and payroll taxes. Manpower's contract with Public Service Company of New Mexico states that Manpower is an independent contractor and that Manpower assumes all liability and agrees to protect the company from all suits.

{5} The client supervises the day-to-day activities of the assigned employee. The client does not pay the employee; rather, the client pays Manpower. Manpower then pays the employee's wages, benefits, and withholdings. (These payroll obligations will be referred to as "payroll" in this opinion.) The client does not pre-pay payroll or create a fund from which Manpower draws to pay payroll. Manpower's employees complete W-4 forms and Manpower issues W-2s. In addition to amounts representing payroll, the client also pays an amount that Manpower attributes to its overhead and profit. Manpower paid $904,066 for tax on its receipts used for payroll. Thereafter, it submitted a refund request to the Department. The Department took no action and the request was deemed denied. Manpower filed a refund action in district court pursuant to NMSA 1978, § 7-1-26 (2001) to recover the taxes paid.

{6} The district court found that Manpower was engaged in the selling of temporary staffing services under mostly oral contracts; that Manpower had employees whom Manpower used to provide temporary staffing services for its clients; that Manpower's clients could not direct Manpower to terminate an employee, but could only ask that the employee be removed from the job site; that, after Manpower provided its services and paid its own business-related expenses, Manpower billed its clients and collected the amounts set by contract, as opposed to collecting prepaid amounts from clients for expenses Manpower incurred in hiring its employees; that Manpower was acting as a principal on its own behalf and not as an agent on behalf of a principal; that Manpower's employees were an integral part of its business and not an integral part of the clients' businesses; that Manpower controlled for whom an employee worked, where and when the employee was to report to work, and the duration of the work assignment; and that the payroll was Manpower's own obligation and was not made as an intermediary or on behalf of its clients.

{7} The district court also concluded that "Manpower did not meet its burden of overcoming the presumption of correctness that attaches to the ... Department's assessment of tax and the presumption that [Manpower's] receipts are taxable"; that "Manpower's receipt of payroll ... as a reimbursement of expenditures incurred in ... providing [its] services [constituted] gross receipts as defined by [Section 7–9–3(F)]"; and that the court was "not persuaded that Manpower engaged in any of the necessary elements needed to prove its case." The court upheld the Department's assessments, including interest and penalty.

{8} Manpower contends on appeal that it does not owe tax because it received the amounts "purely as a conduit" between its clients and its employees. Manpower contends this is consistent with, and based upon, the Department's regulation, 3.2.1.19(E)(2) NMAC (2002), which states that funds that pass through the hands of a "joint employer" for the purpose of federal labor law are not subject to tax.

{9} Manpower thus asserts the district court erred in determining that Manpower's payment of payroll was its own obligation. Manpower also attacks two other findings of fact on the ground they lack substantial evidence; namely, the findings that Manpower was acting as a principal on its own behalf and not as an agent on behalf of a principal, and that Manpower's employees were an integral part of its business and not an integral part of its clients' businesses.

{10} Further, Manpower attacks the district court's conclusions of law that Manpower did not overcome the statutory presumptions of correct tax assessment and taxability, that the receipts were for performing services rather than acting as the disclosed agent of another, and that Manpower failed to prove the tax assessment did not apply. In essence, Manpower contends its evidence was not only sufficient to rebut the presumptions, but the evidence established that Manpower received the receipts solely as a disclosed agent of its clients, and the evidence "overwhelmingly" established that Manpower was a joint employer with each of its clients pursuant to

which the employees had legally enforceable rights against the client for payroll if Manpower did not pay. Further, Manpower contends that the Department's evidence did not disprove Manpower's joint employer status with its clients.

## DISCUSSION

### Standard of Review

{11} A statutory tax refund action is a civil action initiated by a complaint setting forth the circumstances and demanding a refund. *See* § 7–1–26(C)(2). The district court's findings of fact are reviewed by this Court to determine whether they are supported by substantial evidence. *Creson v. Amoco Prod. Co.*, 2000–NMCA–081, ¶ 10, 129 N.M. 529, 10 P.3d 853. Questions of law, such as interpretation of a statute, are reviewed by this Court de novo, without deference to the district court's decision. *Id.; Johnson v. Yates Petroleum Corp.*, 1999–NMCA–066, ¶ 3, 127 N.M. 355, 981 P.2d 288. Findings that are not directly attacked are deemed conclusive and are binding on appeal. *See* Rule 12–213(A)(3) NMRA 2002; *Stueber v. Pickard*, 112 N.M. 489, 491, 816 P.2d 1111, 1113 (1991).

### Presumptions and Burden

■ {12} There exists a statutory presumption that all receipts are taxable. NMSA 1978, § 7–9–5(A) (2002). The taxpayer claiming that receipts are not taxable bears the burden of proving the assertion. *TPL, Inc. v. Taxation & Revenue Dep't*, 2000–NMCA–083, ¶ 8, 129 N.M. 539, 10 P.3d 863, *cert. granted*, 129 N.M. 519, 10 P.3d 843 (Sept. 13, 2000); *ITT Educ. Servs., Inc. v. Taxation & Revenue Dep't*, 1998–NMCA–078, ¶ 5, 125 N.M. 244, 959 P.2d 969; *Brim Healthcare, Inc. v. Taxation & Revenue Dep't*, 119 N.M. 818, 820, 896 P.2d 498, 500 (Ct.App.1995); *Wing Pawn Shop v. Taxation & Revenue Dep't*, 111 N.M. 735, 741, 809 P.2d 649, 655 (Ct.App.1991).

■ {13} There also exists a statutory presumption of correctness of the Department's tax assessment. NMSA 1978, § 7–1–17(C) (1992). "The effect of the presumption of correctness is that the taxpayer has the burden of coming forward with some coun-

tervailing evidence tending to dispute the factual correctness of the assessment made by the secretary. Unsubstantiated statements that the assessment is incorrect cannot overcome the presumption of correctness." 3.1.6.12(A) NMAC (2002). A taxpayer may rebut the presumption, shifting the burden to the Department to show the correctness of the tax assessment. *See Archuleta v. O'Cheskey*, 84 N.M. 428, 431, 504 P.2d 638, 641 (Ct.App.1972).

### The Tax and the Disclosed Agency Capacity Exception

 {14} Tax is imposed for the privilege of engaging in business and for services performed in New Mexico. *See* NMSA 1978, § 7–9–4(A) (1990); § 7–9–3(F). "The tax is imposed upon gross receipts, which means 'the total amount of money or the value of other considerations received from selling property or from performing services.'" *Brim*, 119 N.M. at 820, 896 P.2d at 500 (quoting *N.M. Enters., Inc. v. Bureau of Revenue*, 86 N.M. 799, 800, 528 P.2d 212, 213 (Ct.App.1974)). Receipts include payments received for one's own account and then expended to meet one's own responsibilities. *Id.* However, no tax is imposed on amounts received "solely on behalf of another in a disclosed agency capacity." § 7–9–3(F)(2)(f); *see Carlsberg Mgmt. Co. v. Taxation & Reve-*

*nue Dep't,* 116 N.M. 247, 250, 861 P.2d 288, 291 (Ct.App.1993) ("An agent for a disclosed principal is, therefore, not liable for sales-type taxes on amounts for which he is reimbursed by his principal."). Manpower does not attack the district court's conclusion of law that the receipts attributed to payroll constituted "reimbursement of expenditures incurred."

{15} The disclosed agency capacity exception in Section 7–9–3(F)(2)(f) requires our discussion of two Department regulations, 3.2.1.19(C) and 3.2.1.19(E). Such regulations are "presumed to be a proper implementation of the provisions of the laws that are charged to the [D]epartment." NMSA 1978, § 9–11–6.2(G) (1995). Manpower contends it does not have to pay tax because it is a "joint employer" under Regulation 3.2.1.19(E)(2). The Department argues that Manpower is not a joint employer under Regulation 3.2.1.19(E)(2), and that it owes tax under Regulation 3.2.1.19(C)(3). We also discuss two cases in which the assessments predate the 1994 enactment of Section 7–9–3(F)(2)(f) and the 1997 adoption of Regulation 3.2.1.19(E) but which remain instructive on the tax issues; namely, *Brim* and *Carlsberg.*

### 1. Department Regulation 3.2.1.19(E)

{16} Manpower asserts that Regulation 3.2.1.19(E)[1] is applicable. Under this regu-

---

1. Regulation 3.2.1.19(E) reads:

 (1) A person who engages in the leased employee business in New Mexico is performing services in New Mexico. The person's receipts from performing the employee leasing services in New Mexico are subject to the gross receipts tax, except as provided otherwise in Paragraph (2) of [this subsection].

 (2) When a person engaging in the leased employee business is *a "joint employer", as that term is used by the United States department of labor* for purposes of enforcing federal labor law, then the person's receipts of amounts comprising *wages, taxes withheld with respect to the wages, Federal Insurance Contributions Act payments, unemployment compensation payments and the like* with respect to the joint employees of the client and the person engaging in the leased employee business *are not receipts from performing employee leasing services and are not subject to the gross receipts tax. Such receipts instead are receipts of a disclosed agent on behalf of others.*

 (3) Example: X engages in the leased employee business in New Mexico. Under the terms of its contracts, X is primarily responsible and liable for payment of *employee wages, all payroll taxes, employer contributions required under the Federal Insurance Contributions Act and for providing an employee benefits package which includes health insurance and other benefits as specified in each contract.* If X fails to properly pay the payroll, payroll taxes or unemployment insurance or if X fails to comply with other administrative functions, X's client, as joint employer, is responsible for such compliance or payment. X has determined itself to be a "joint employer" as that term is used by the United States department of labor for the purpose of enforcing federal labor law. The client is also required to place a cash deposit to guarantee payment of the client's obligations under the contract. Every week each of X's clients is required to pay X the client's payroll obligation for the week plus an additional two percent (2%) as X's fee. X has no gross receipts from the amount representing the payroll obligation;

lation, no tax is imposed on receipts "[w]hen a person engaging in the leased employee business is a 'joint employer', as that term is used by the United States department of labor for purposes of enforcing federal labor law." 3.2.1.19(E)(2) NMAC. This is because "[s]uch receipts instead are receipts of a disclosed agent on behalf of others." *Id.*

{17} Based on the regulation language "[w]hen a person engaging in the leased employee business is a 'joint employer', ... for purposes of enforcing federal labor law," Manpower engages in a discussion of federal labor law. For example, Manpower discusses a United States Department of Labor (DOL) regulation adopted pursuant to the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201–19 (2000) (FLSA), that "make[s] available in one place the general interpretations of the [DOL] pertaining to the joint employment relationship under the [FLSA]." 29 C.F.R. §§ 791.1, .2 (2002). Manpower further discusses an opinion letter of the Wage–Hour Administrator in which, according to Manpower, the Administrator on an issue of employer responsibility for record keeping stated: "[T]ypically employees of a temporary help company working on assignments in various business establishments are joint employees of both the temporary help company and the business establishment in which they are employed." Opinion Letter, 10/1/68, ¶ 30,883 of CCH Wage & Hour & Administrative Rulings. Manpower also points to a DOL regulation under the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601–54 (1999) (FMLA), which discusses how "joint employment is treated under FMLA." 29 C.F.R. § 825.106 (2002). Pointing to particular language of Regulation 3.2.1.19(E) (*see* emphasized language in footnote 1), Manpower asserts it was a joint employer and therefore its payroll receipts are not subject to tax because "under federal labor law, as well as 3.2.1.19(E) NMAC, the obligation was clearly at least in part that of Manpower's customer, who could be held liable for the entire amount."

{18} Manpower acknowledges it is not an employee leasing firm, but rather a temporary staffing agency. As Manpower understands the difference, a temporary staffing agency is delegated the authority by its client to hire and it creates the employee/employer relationship, whereas in an employee leasing arrangement, the client hires and places the person on the employee leasing firm's payroll. That Regulation 3.2.1.19(E)(2) places a joint employer specifically within the context of a "leased employee business," Manpower argues, is irrelevant because, according to Manpower, "no material distinction for the purposes of this case [exists] between an employee leasing agency or a temporary employment agency," in that both involve similar relationships and thus either can be a joint employer.

{19} Manpower asserts that a factual determination of joint employment must be made and must be based on the economic realities of, among other things, the client's authority to reject and supervise employees, control job performance, and determine salary. Manpower cites FLSA cases to make the point. *See Real v. Driscoll Strawberry Assocs., Inc.,* 603 F.2d 748, 755 (9th Cir.1979) (stating that "[e]conomic realities, not contractual labels, determine employment status for the remedial purposes of the FLSA"); *McLaughlin v. Lunde Truck Sales, Inc.,* 714 F.Supp. 920, 924 (N.D.Ill.1989) (giving "examples of where the 'economic reality' of the circumstances dictates that a (joint) employment relationship exists").

{20} Manpower then lays out the following as undisputed facts showing such economic realities:

> While Manpower does cut payroll checks for employees, the employee's activities are under the direct, day-to-day control of its customer. The customer, among other things, sets the employee wage; supervises and manages day-to-day activities and work schedules; trains the employee for the customer's needs; provides tools and supplies to the employee; subjects the em-

this amount is not subject to the gross receipts tax. The additional two percent (2%), however is X's fee for performing employee leasing services and is subject to tax.

(Emphasis is Manpower's.)

ployee to work rules; [and] controls work place conditions.

{21} The Department responds to the issue of joint employer status by arguing that Manpower cannot rely on Regulation 3.2.1.19(E) in any regard because Manpower is not an "employee leasing business." In fact, the Department barely discusses the question of joint employer status, focusing almost solely on whether Manpower is an employee leasing business. The Department distinguishes selling temporary staffing services from leasing employees. To show the difference, the Department refers to the Employee Leasing Act, NMSA 1978, §§ 60–13A–1 to –14 (1993, as amended through 1995) (the ELA), which forbids a person from doing business in New Mexico as an employee leasing contractor unless the person is registered as required under the ELA. *See* § 60–13A–3.

{22} "Employee leasing arrangement," "employee leasing contractor," "leased worker," and "temporary worker," are defined in the ELA. § 60–13A–2(D), (E), (F), (H). An " 'employee leasing arrangement' means any arrangement in which a client contracts with an employee leasing contractor for the contractor to provide leased workers to the client; provided, 'employee leasing arrangements' does not include temporary workers." § 60–13A–2(D). " '[E]mployee leasing contractor' means any person who provides leased workers to a client ... through an employee leasing arrangement," and " 'leased worker' means a worker provided to a client through an employee leasing arrangement." § 60–13A–2(E), (F). In contrast, a "temporary worker" is defined as "a worker hired and employed by an employer to support or supplement another's work force in special work situations, such as employee absences, temporary skill shortages, temporary provision of specialized professional skills, seasonal workloads and special temporary assignments." § 60–13A–2(H). The ELA deems

the contractor and its client to be co-employers for the purposes of the Workers' Compensation Act, requiring that both be co-insureds, assuring client liability as a principal for the workers' compensation obligation, and at the same time granting the client the benefit of the workers' compensation laws' exclusive remedy requirement. *See* § 60–13A–5(B), (C).

{23} The Department emphasizes that the ELA requires employee leasing contractors to be registered with the State, § 60–13A–3, and that under the ELA:

[t]he employment relationship between the client and the leased workers shall be established by written agreement between the employee leasing contractor and the client. Written notice of the employment relationship and of compliance with the requirements of [workers' compensation insurance] shall be given by the contractor to each leased worker.

§ 60–13A–9. Thus, through the ELA, the Legislature created a specific circumstance of co-employer status for those engaged in the employee leasing business by which worker, contractor, client, and government would be aware of the obligation for workers' compensation insurance.

{24} In an attempt to rebut the Department's contentions, Manpower argues that the use of this device for interpretation of the meaning of leased employee business in Regulation 3.2.1.19(E) does not preclude compliance with the regulation in the gross receipts tax setting by a temporary staffing agency because the leased employee business and temporary staffing agency are "performing the exact same functions."

## 2. Department Regulation 3.2.1.19(C) NMAC

{25} Manpower contends Regulation 3.2.1.19(C)[2], which relates specifically to re-

**2.** The regulation in pertinent part reads:

(1) The receipts of any person received as a reimbursement of expenditures incurred in connection with the performance of a service or the sale or lease of property are gross receipts as defined by Subsection F of Section 7–9–3 NMSA 1978, unless that person incurs

such expense as agent on behalf of a principal while acting in a disclosed agency capacity. An agency relationship exists if a person has the power to bind a principal in a contract with a third party so that the third party can enforce the contractual obligation against the principal.

imbursed expenses and requires a disclosed agency with specific bookkeeping requirements, was voided in *Carlsberg* and is therefore inapplicable. We disagree. *Carlsberg* addressed a Department policy that had been employed with respect to tax assessment and apparently was adopted into Regulation 3.2.1.19(C) at some point after the tax year at issue. *See* 116 N.M. at 250, 861 P.2d at 291. *Carlsberg* held as "unreasonable and contrary to law" that part of the policy that allowed "exemption for reimbursement of agency costs only when the principal is disclosed," and held that disclosure of the agency was irrelevant under the circumstances in *Carlsberg. Id.* at 252, 861 P.2d at 293. However, the fact that Section 7–9–3(F)(2)(f), enacted after *Carlsberg,* excludes from tax those receipts received solely on behalf of another in a *disclosed* agency capacity, indicates that the Legislature intended disclosure to be reinstated as a required circumstance for exclusion from tax. The enactment of Section 7–9–3(F)(2)(f) rendered the *Carlsberg* language ineffective.

{26} In support of the district court's dismissal, the Department first argues that the court's findings are supported by sufficient evidence and support the conclusion that the amounts Manpower received were not received solely on behalf of another in a disclosed agency relationship as required under Section 7–9–3(F)(2)(f). It next argues that even were an agency relationship to have existed, it was not disclosed. Specifically, Manpower failed to establish that it had the authority to bind its clients contractually so the employees could enforce the contract against the client, that Manpower accounted for its receipts as a reduction of expense and not as revenue, that Manpower separately stated the expenses on the billings to its clients, and that Manpower identified the receipts in its books and records as reim-

bursements of expenses incurred on behalf of its clients. *See* 3.2.1.19(C)(1), (2), (3) NMAC.

{27} Anticipating we might not accept its argument that Regulation 3.2.1.19(C)(2) is void under *Carlsberg,* Manpower asserts the agency was disclosed because Manpower, its clients, and the employees "all knew the details of the relationship and whom was doing what for whom" in regard to payroll. Manpower also asserts it "substantially complied" with the gross receipts statutes and regulations. Manpower concedes that it "often did not separately state the employee expenses on invoices" to its clients, but asserts that its clients were "fully aware of the separate amounts."

### 3. The *Brim* and *Carlsberg* Cases

{28} The only New Mexico cases closely related to the issues are *Brim* and *Carlsberg.* As earlier indicated, the tax assessments in these two cases predate the application of Section 7–9–3(F)(2)(f). The Department argues that although these two cases "are difficult to reconcile," the facts in the present case more closely parallel those of *Brim.* Manpower argues that *Carlsberg* is closer.

{29} In *Carlsberg,* the taxpayer (the company in Manpower's position) contracted with the owner of an apartment complex to manage the apartments with the taxpayer's own employees. *Carlsberg,* 116 N.M. at 248–49, 861 P.2d at 289–90. In a written contract detailing all management aspects, the owner was designated as "Owner," and taxpayer was designated as "Agent." *Id.* at 249, 861 P.2d at 290. Although the contract provided that the employees were only employees of the taxpayer, to be hired, paid, supervised, and discharged by the taxpayer, the taxpayer had to abide by a management plan specifying the number of people to hire for each task, employee wages, how the apartments were to be managed, and giving the owner's

(2) Receipts from the reimbursement of expenses incurred as agent on behalf of a principal while acting in a disclosed agency capacity are not included in the agent's gross receipts if:

(a) the agent accounts for such receipts in the agent's books and records as a reduction of the expense and not as revenue; and

(b) the expenses are separately stated on the agent's billing to the client and are identified in the agent's books and records as reimbursements of expenses incurred on behalf of the principal party.

(3) If these requirements are not met, the reimbursement of expenses are included in the agent's gross receipts.

3.2.1.19(C) NMAC.

president the absolute authority in making decisions regarding the apartments. *Id.* The employees' salaries were paid from the owner's general operating account, an account also used to reimburse the taxpayer for workers' compensation and taxes paid on behalf of the employees. *Id.* The taxpayer treated the reimbursements as an offset for expenses. *Id.*

{30} *Carlsberg* held that the taxpayer was an agent of the owner and therefore did not have to pay tax on the amounts received for reimbursement for employee-related expenses. *Id.* at 252–53, 861 P.2d at 293–94. This Court stated that the "key characteristic of an agency relationship" is the principal's control over the agent, and detailed the owner's retention of control, delegation of specified duties, delegation of authority, and "ultimate approval authority over Taxpayer's actions," as significant circumstances. *Id.* at 250–52, 861 P.2d at 291–93. Yet this Court indicated that control was "only one necessary element to prove entitlement to the agency tax exemption." *Id.* at 250, 861 P.2d at 291. Stating that "the agency relationship has to be one in which the agent could bind the principal in dealings with third parties," *id.,* this Court held the owner obligated for the employees' payroll as "an undisclosed principal is liable for contracts its agent enters into in the ordinary course of business," *id.* at 252, 861 P.2d at 293. *Carlsberg* also states, "the indemnification clause in the Agreement, requiring Owner to pay Taxpayer for employment expenses, indicates to us that payment of wages to on-site employees was ultimately the duty of Owner." *Id.*

{31} *Carlsberg* was thus decided primarily on the basis of the owner's control over the taxpayer, but also to some extent because the taxpayer, as agent of an undisclosed principal, and based on an indemnity agreement, could bind the principal to pay the employees' payroll. Following *Carlsberg,* the Legislature in 1994 enacted Section 7–9–3(F)(2)(f), requiring that the relationship between taxpayer and client be that of a "disclosed agency" for taxpayer avoidance of tax. *See* 1994 N.M. Laws ch. 45, § 1.

{32} *Brim* was decided less than two years following *Carlsberg.* In *Brim* the taxpayer contracted with two hospitals to manage the hospitals with the taxpayer's own employees. 119 N.M. at 819, 896 P.2d at 499. The contracts provided that the hospitals would reimburse the taxpayer for salaries, fringe benefits, and expenses for the taxpayer's management employees working at the hospitals. *Id.* The taxpayer recruited management employees, and selected the personnel for each hospital, although with the approval of the hospital boards of directors. *Id.* The taxpayer was "essentially responsible for the management function of the hospitals," including day-to-day management and operation. *Id.* The employees kept the boards informed about hospital operations, but were primarily accountable to the taxpayer for their performance in carrying out the taxpayer's management plan for the operation of the hospitals. *Id.* The contracts stated that the taxpayer was "acting at all times as an independent contractor in performing its services and is not an agent of the hospitals," and that neither party was liable for the debts, obligations, or liabilities of the other. *Id.*

{33} The taxpayer in *Brim* relied on *Carlsberg* to support its position it was not required to pay tax. *Brim,* 119 N.M. at 820, 896 P.2d at 500. This Court in *Brim* distinguished *Carlsberg* on the basis that the taxpayer in *Brim* was "not merely a conduit for funds to be paid to third parties," but was "receiving the payments from the hospitals for its own account and then expending them to meet its own responsibilities." *Id. Brim* stated that "the most significant distinction between this case and *Carlsberg* 'lies in the fact that in the instant case [*Brim* ], there is no broad indemnification clause which has the effect of shifting the duty to pay wages to the employees to the hospitals.' " *Id. Brim* also noted other factors such as the right of the taxpayer to make changes in the employees, the taxpayer's control over when the employees were paid, the first-line reporting by the employees to the taxpayer, the employees' reporting to the hospital boards as part of the taxpayer's management team, and, except as to negligence claims, the hospitals had no liability for the taxpayer's obligations to pay the employees. *Id.* Further

distancing Carlsberg, Brim pointed out that this evidence showed the taxpayer "alone was responsible to its employees for their salaries and benefits." *Id.* Finally, *Brim* specifically pointed out that, unlike *Carlsberg,* the contracts expressly stated that the taxpayer was not the agent of the hospitals. *Id.*

{34} This Court in *Brim* required the taxpayer to pay tax, determining that, under the facts, "[t]he employees continued their relationship with their employer ... and their salaries remained the legal obligation of [the taxpayer]" who received the amounts for its own use and benefit, and paid the amounts out to satisfy its own obligations. *See id.* at 822, 896 P.2d at 502.

{35} In sum, *Carlsberg* did not require the taxpayer to pay tax; *Brim* did. Neither case was decided under Section 7–9–3(F)(2)(f). *Carlsberg* must be considered questionable precedent given the subsequent enactment of Section 7–9–3(F)(2)(f). *Brim* does not discuss Regulation 3.2.1.19(C) and was decided before Regulation 3.2.1.19(E) was effective, which was in October 1997. To the extent these cases remain viable, they are merely instructive for any analyses in regard to control by Manpower's clients on the issue of agency (*Carlsberg*), and with respect to the presence or absence of an agreement by which Manpower's clients can be held responsible to the employee for payroll obligations on the issue of binding the principal (*Brim*). Manpower is left unassisted by either case. Manpower proved no agreement by which any client could be held ultimately obligated for payroll as among the clients, Manpower, and the employees. Furthermore, the issue of client control is not a particularly significant consideration in the present case.

### 4. Applicability of the Statute and Regulations

■ {36} Regulation 3.2.1.19(E)(1) and (2) permit a taxpayer to escape tax if the taxpayer is performing "employee leasing services" and is a "joint employer." The regulation requires that Manpower be an "employee leasing business." Although nowhere is this regulation expressly tied to the ELA, it is not unreasonable for the Department to argue that "employee leasing business" in the regulation must be construed to require Manpower to be the business defined in the ELA, because the written agreement and disclosure requirements in the ELA would bring Manpower within the letter and purpose of Section 7–9–3(F)(2)(f).

{37} Regulation 3.2.1.19(C) defines an "agency relationship" to exist if "a person has the power to bind a principal in a contract with a third party so that the third party can enforce the contractual obligation against the principal." 3.2.1.19(C)(1) NMAC. Here, this must be construed to define "disclosed agency capacity" by two required circumstances: (1) the agent (Manpower) has the authority to bind the principal (the client) to an obligation (to the employee) created by the agent (Manpower), and (2) the beneficiary of that obligation (the employee) is informed by contract that he or she has a right to proceed against the principal (the client) to enforce the obligation. Yet, under the regulation, even the fulfillment of these two circumstances appears to be insufficient for the taxpayer to earn exclusion from tax. To prove its exclusion entitlement the taxpayer must also engage in specific bookkeeping and billing procedures. *See* 3.2.1.19(C)(2) NMAC.

{38} We are unpersuaded by Manpower's claim of protection under Regulation 3.2.1.19(E)(1) and (2). Section 7–9–3(F)(2)(f) requires a disclosure to the employee of an agency relationship. This breaks down into the requirements that there be a relationship by which the principal is liable (and knows he is liable) to the employee for payroll if the agent fails to pay, and that the agent disclose this relationship and obligation to the employee, requirements obviously intended by the Department to be enforced through Regulation 3.2.1.19(C) as well as through Regulation 3.2.1.19(E)(2). That said, we fail to see why under Regulation 3.2.1.19(E)(1) and (2) a taxpayer must be *both* an employee leasing contractor under the ELA *and* a joint employer under federal law, since it would appear either would be sufficient to provide the agency relationship and disclosure the Department interprets Section 7–9–3(F)(2)(f) to

require. In this case, Manpower established neither of the two prongs of required proof and therefore did not rebut the presumptions that the reimbursed expenses are taxable and that the assessment was correct.

{39} Manpower showed no evidence of any contract with its employees, as required in Regulation 3.2.1.19(C)(1). Manpower states only that its employees were aware of the relationship. Manpower nowhere specifically sets out whether the employees were told they could enforce a payroll obligation against the client. Manpower fails even to show any understanding, oral, or written, with any of its clients that the client would or could be obligated to the employee for payroll. These failures in proof make it unnecessary to determine whether the relationship between Manpower and its clients was one of principal-agent, rather than an independent contractor.

{40} Manpower fared no better in its attempt to meet the requirements of Regulation 3.2.1.19(E). Manpower is admittedly not a leased employee business. Its argument that it should be considered a leased employee business because the economic realities require no distinction to be drawn between a leased employee business and its own temporary staffing business for the purposes of taxation is not persuasive. It is not the economic realities that control in this circumstance, but compliance with the disclosed agency requirement. Moreover, Manpower has not shown joint employer status or provided this Court with legal authority based on which we can comfortably determine that the DOL would necessarily determine Manpower's clients and Manpower to be joint employers.[3]

{41} We hold substantial evidence supports the district court's determination that Manpower was not acting in a disclosed agency capacity as required under Section 7–9–3(F)(2)(f).

---

**3.** We seriously question whether the Department contemplated by Regulation 3.2.1.19(E)(2) a full-scale trial on whether employers are joint employers under federal labor law. It would appear that a DOL determination of joint employer status is the showing the Department has in

## CONCLUSION

{42} We affirm the final order of the district court.

{43} **IT IS SO ORDERED.**

WE CONCUR: RICHARD C. BOSSON, Chief Judge, and JAMES J. WECHSLER, Judge.

mind. At the very least, something more than Manpower's listing of "economic realities" and calling our attention to fairly general DOL documents is required to establish joint employer status.