This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

No. A-1-CA-37992

**BARBARA GARCIA, Deceased, by the Personal Representative of the Wrongful Death Estate, MARIE TRUJILLO,**

       Plaintiff-Appellee,

v.

**WW HEALTHCARE, LLC d/b/a PRINCETON PLACE; TWO P MANAGEMENT, LLC; ONPOINTE BUSINESS SERVICES, LLC; ONPOINTE MANAGEMENT, LLC; HORACE WINCHESTER; JERRY WILLIAMSON; CYNTHIA HOFFECKER; and KATHY SOWERS, Administrator,**

       Defendants-Appellants.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Victor S. Lopez, District Judge**

Harvey and Foote Law Firm, LLC
Jennifer J. Foote
Dusti Harvey
Albuquerque, NM

for Appellee

The Checkett Law Firm, PLLC
John J. Checkett
Paul J. Sheston
Scottsdale, AZ

for Appellants

**MEMORANDUM OPINION**

**BOGARDUS, Judge.**

**{1}**      WW Healthcare, LLC, d/b/a Princeton Place, Two P Management, LLC, OnPointe Business Services, LLC, OnPointe Management, LLC, Horace Winchester, Jerry Williamson, Cynthia Hoffecker, and Kathy Sowers, Administrator (collectively Defendants) appeal the district court's denial of Defendants' motion to compel arbitration. At issue is an arbitration agreement (Agreement) signed by Marie Trujillo (Daughter) in connection with the admission of her mother to a nursing home. Defendants argue the district court erred in denying their motion to compel arbitration because (1) Daughter had authority to agree to arbitration, (2) the Agreement was not unconscionable, and (3) the Agreement met the American Health Lawyers Association (AHLA) requirements. We affirm.

## BACKGROUND

**{2}**      This case arises from a wrongful death and negligence suit concerning the care Barbara Garcia (Resident) received at the Princeton Place nursing home (the Facility). As part of Resident's admission to the Facility in January 2013 Daughter signed an arbitration agreement on Resident's behalf.

**{3}**      Daughter, as personal representative of Resident's estate, later filed suit for wrongful death and negligence. In response, Defendants moved to compel arbitration. The parties briefed the issues in the district court and submitted exhibits providing factual support for their arguments. The exhibits included affidavits from Daughter, the Facility's admission nurse, as well as medical records for Resident.

**{4}**      After briefing and argument from the parties, the district court entered an order denying Defendants' motion to compel arbitration. In relevant part the district court's order stated that "Defendants failed to establish the existence of a valid contract; they failed to meet their burden of establishing that [Daughter] had authority to agree to arbitration on [Resident's] behalf." Defendants appeal.

## DISCUSSION

### I.      Standard of Review

**{5}**      "We apply a de novo standard of review to a district court's denial of a motion to compel arbitration." *Cordova v. World Fin. Corp. of N.M.*, 2009-NMSC-021, ¶ 11, 146 N.M. 256, 208 P.3d 901. The question of "[w]hether a valid contract to arbitrate [a dispute] exists is a question of state contract law." *DeArmond v. Halliburton Energy Servs., Inc.*, 2003-NMCA-148, ¶ 9, 134 N.M. 630, 81 P.3d 573. "The party attempting to compel arbitration carries the burden of demonstrating a valid arbitration agreement." *Corum v. Roswell Senior Living, LLC*, 2010-NMCA-105, ¶ 3, 149 N.M. 287, 248 P.3d 329.

## II. The District Court Did Not Err in Denying Defendants' Motion to Compel Arbitration

**{6}** "When a party agrees to a non-judicial forum for dispute resolution, the party should be held to that agreement." *Barron v. Evangelical Lutheran Good Samaritan Soc'y*, 2011-NMCA-094, ¶ 14, 150 N.M. 669, 265 P.3d 720 (internal quotation marks and citation omitted). However, "New Mexico courts have clearly distinguished those situations where lack of agreement by the parties renders an arbitration clause unenforceable." *Id.* ¶ 15; *see Heye v. Am. Golf Corp.*, 2003-NMCA-138, ¶ 8, 134 N.M. 558, 80 P.3d 495 (stating that a legally enforceable agreement to arbitrate is a prerequisite to arbitration and without such agreement, parties will not be forced to arbitrate). For this reason, "[t]he party attempting to compel arbitration carries the burden of demonstrating a valid arbitration agreement." *Corum*, 2010-NMCA-105, ¶ 3. As relevant to this case, "a valid arbitration agreement signed by a competent party binds that party's estate and statutory heirs in a subsequent wrongful death action." *Estate of Krahmer ex rel. Peck v. Laurel Healthcare Providers, LLC*, 2014-NMCA-001, ¶ 1, 315 P.3d 298.

**{7}** Defendants first argue Daughter had authority to agree to arbitration, pointing to various documents not in the record. Defendants contend they put the district court on notice as to the existence of these records but were not afforded the opportunity to submit them. Our review of the record indicates, however, that Defendants did in fact have an opportunity to submit these documents, but failed to ensure that the documents became part of the record at the hearing on the matter. Regardless, "[i]t is not our practice to rely on assertions of counsel unaccompanied by support in the record. The mere assertions and arguments of counsel are not evidence." (internal quotation marks and citation omitted)). *Chan v. Montoya*, 2011-NMCA-072, ¶ 9, 150 N.M. 44, 256 P.3d 987; *accord* Rule 12-318(A)(4) NMRA (requiring arguments to be supported with "citations to . . . [the] record proper, transcript of proceedings, or exhibits relied on"). Defendants cannot rely on records we are unable to review on appeal. Accordingly, we decline to address Defendants' arguments unaccompanied by support in the record.

### A. Defendants Failed to Establish Daughter's Authority Under Principles of Agency

**{8}** Defendants argue Daughter had actual and apparent authority to agree to arbitration as Resident's agent. For the following reasons, we disagree.

**{9}** Under principles of agency, an agent's agreement to a contract may bind the principal. *See MPC Ltd. v. N.M. Tax'n & Revenue Dep't*, 2003-NMCA-021, ¶ 30, 133 N.M. 217, 62 P.3d 308 (stating that in an agency relationship the agent has power to bind the principal in dealings with third parties). "Whether an agency exists is a question of fact to be determined from the circumstances of each case." *Tercero v. Roman Catholic Diocese of Norwich, Conn.*, 2002-NMSC-018, ¶ 12, 132 N.M. 312, 48 P.3d 50. The party asserting the existence of an agency relationship bears the burden of establishing such a relationship. *Corona v. Corona*, 2014-NMCA-071, ¶ 22, 329 P.3d

701. In order to establish an agency relationship, the party must demonstrate "that the principal has in some manner indicated that the agent is to act for him, and that the agent so acts or agrees to act on his behalf and subject to his control." *Totah Drilling Co. v. Abraham*, 1958-NMSC-102, ¶ 19, 64 N.M. 380, 328 P.2d 1083.

**{10}** Once an agency relationship is established, "the principal is [ordinarily] liable for the acts of his agent when acting within the scope of the agent's authority." *Stewart v. Potter*, 1940-NMSC-052, ¶ 17, 44 N.M. 460, 104 P.2d 736. The authority of an agent may be: (1) actual, in that it "is given to the agent by the principal in terms that are express, or in terms that are implied from words or conduct of the principal to the agent or from the circumstances of the relationship[,]" or (2) apparent, in that it "arises from manifestations by the principal to the third party and can be created by appointing a person to a position that carries with it generally recognized duties." *Barron*, 2011-NMCA-094, ¶ 16 (internal quotation marks and citations omitted).

**{11}** Here, it is undisputed that Daughter signed the Agreement. Thus, to prove a valid arbitration agreement sufficient to bind Resident's estate, Defendants bore the burden of demonstrating Daughter had actual or apparent authority to sign the Agreement as Resident's agent. *See Corona*, 2014-NMCA-071, ¶ 22.

**{12}** Defendants argue Daughter had actual authority to agree to arbitration on Resident's behalf because "[t]he evidence indicates that [Daughter] was given authority (either expressly or in other terms that were implied from words or conduct) by [Resident.]" Defendants contend Resident had a well-documented history of lacking capacity to contract, Daughter was Resident's primary caregiver who made decisions on Resident's behalf, and Resident entrusted Daughter to manage Resident's affairs.[1] We are unpersuaded.

**{13}** Here, there is no evidence in the record establishing that Resident expressly gave Daughter authority to agree to arbitration. *See Barron*, 2011-NMCA-094, ¶ 16. The evidence instead indicates that during Resident's lifetime Resident never appointed Daughter as Resident's Power of Attorney (POA), guardian, or conservator, and never selected Daughter as Resident's surrogate decision-maker for healthcare decisions. Nor do Resident's medical records—which indicate Resident suffered from severe cognitive impairment and dementia—demonstrate that Resident impliedly gave Daughter authority to agree to arbitration. Although one medical record notes that Daughter administered Resident's medications and managed Resident's money, even if we were to agree this record demonstrates that Daughter had some authority over Resident's affairs, we cannot say Daughter would have been acting within the scope of this authority by agreeing to arbitration on Resident's behalf—especially in light of evidence Daughter was not Resident's POA, guardian, conservator, or healthcare decision-

---

[1]Defendants also make the following claims: A physician examined Resident to determine her capacity and found Resident "grossly incapable of taking care of her own affairs[;]" Resident could not recall the names of her other two children; and Daughter never claimed she "lacked authority over [Resident]'s affairs" in the four years Resident resided at the Facility. We do not address these claims because they are unsupported in the record. *See Chan*, 2011-NMCA-072, ¶ 9.

maker. *See Stewart*, 1940-NMSC-052, ¶ 17 ("[T]he principal is [ordinarily] liable for the acts of his agent when acting within the scope of the agent's authority."). Based on the record, we conclude Defendants failed to carry their burden of demonstrating that Daughter had actual authority to agree to arbitration.

**{14}** As to apparent authority, Defendants argue the Facility had access to information from which it could reasonably conclude Daughter had authority to act on Resident's behalf. Defendants point to transfer facility medical records, medical records stating Resident was incapacitated, admission paperwork, and Daughter's "own actions, holding herself out as having authority to act on behalf of [Resident.]" Defendants also argue that Daughter acted within the scope of this apparent authority and has failed to show the Facility "acted imprudently or without diligence in relying on [Daughter]'s own representations that she could act on [Resident's] behalf."[2] We disagree.

**{15}** Here, evidence in the record fails to establish that *Resident* made manifestations to the Facility that Daughter had authority to agree to arbitration. *See Barron*, 2011-NMCA-094, ¶ 16; *see also Tercero*, 2002-NMSC-018, ¶ 12 ("To establish apparent authority, the relying party must base the relationship upon words or acts of the principal, and not the representations or acts of the agent." (internal quotation marks and citation omitted)). We cannot say medical records which document Resident's impaired cognitive status and note that Daughter administered Resident's medications and managed Resident's money qualify as such manifestations. *Cf. Barron*, 2011-NMCA-094, ¶¶ 1, 3, 17-18, 38 (concluding that the decedent's granddaughter had apparent authority to sign an arbitration agreement as part of the decedent's admission to a nursing home, reasoning in part that the decedent was mentally competent, alert, and oriented; told the granddaughter "to complete the [decedent's] admission paperwork[;]" and communicated the granddaughter's authority to a nursing home staff member handling admissions).

**{16}** Moreover, evidence in the record indicates the Facility failed to use reasonable diligence and prudence to ascertain whether Daughter had the power to agree to arbitration on Resident's behalf. *See Comstock v. Mitchell*, 1990-NMSC-054, ¶ 4, 110 N.M. 131, 793 P.2d 261 (stating that "a person dealing with an agent must use reasonable diligence and prudence to ascertain whether the agent is acting within the scope of his powers." (internal quotation marks and citation omitted)). The evidence indicates Daughter told a Facility representative she was not Resident's POA but was told by the representative that being Resident's daughter was the same as being Resident's POA. Based on evidence in the record, we conclude Defendants failed to establish that Daughter acted with apparent authority. Accordingly, Defendants failed to carry their burden of demonstrating an agency relationship.

---

[2]In addition, Defendants argue that, "after receiving the benefit of the bargain of acting as [Resident]'s representative, [Daughter] should be *estopped* from denial of such." Defendants do not adequately develop this argument, and we decline to address it further. *See Corona*, 2014-NMCA-071, ¶ 28 ("This Court has no duty to review an argument that is not adequately developed.").

**B.    Defendants Failed to Establish Daughter's Authority Under the Uniform Health-Care Decisions Act**

**{17}**    Defendants next argue that Daughter had statutory authority to sign the Agreement under the Uniform Health-Care Decisions Act (the Act), NMSA 1978, §§ 24-7A-1 to -18 (1995, as amended through 2015).[3] Defendants contend that under the Act, a surrogate[4] can make healthcare decisions for a patient who lacks capacity—as Daughter had been doing for many years—when certain preconditions are satisfied. Defendants argue Daughter qualified as a surrogate because Resident lacked capacity as defined in the Act, and that the district court erred by not relying on medical records showing Resident had advanced dementia, "lacked the cognitive ability to handle her own affairs," and suffered from "significant cognitive issues and inability for decision making." In support of these arguments, Defendants cite two provisions of the Act: Sections 24-7A-5 and -11. While we agree Sections 24-7A-5 and -11 are relevant, they compel us to conclude Daughter did not qualify as a surrogate under the Act.

**{18}**    Section 24-7A-5(A) provides in relevant part that "[a] surrogate may make a health-care decision for a patient who is an adult . . . if the patient has been determined *according to the provisions of Section 24-7A-11* . . . to lack capacity and no agent or guardian has been appointed[.]" (Emphasis added.) Section 24-7A-11(B), in turn, provides that "[a]n individual is presumed to have capacity to make a health-care decision[.]" But under Section 24-7A-11(C) "[t]his presumption may be rebutted with the conclusion by two qualified health-care professionals that the patient lacks capacity." *Corum*, 2010-NMCA-105, ¶ 10; *see* § 24-7A-11(C) ("Unless otherwise specified in a written advance health-care directive, a determination that an individual lacks or has recovered capacity or that another condition exists that affects an individual instruction or the authority of an agent *shall be made* by two qualified health-care professionals, one of whom shall be the primary physician." (emphasis added)). This Court's application of Sections 24-7A-5 and -11 in *Corum* is instructive. 2010-NMCA-105, ¶¶ 6-16.

**{19}**    In *Corum*, we concluded that the decedent's husband was not a health-care surrogate under the Act because there was no indication in the record "that there was a determination by two physicians that [the resident] lacked capacity at the time [the h]usband signed the admission agreement[,]" despite the parties stipulating to the resident's lack of capacity. *Id.* ¶¶ 9-10, 16. We reasoned that the determination of lack of capacity was "an essential initial requirement of the statute or statutory condition precedent" which helps protect "the citizens of our state and assures that medical decisions are made according to each individual's desires and best interests." *Id.* ¶ 16.

**{20}**    Similarly, here, there is no indication in the record that there was a determination by two qualified health-care professionals that Resident lacked capacity at the time

---

[3]All references to provisions of the Act in this opinion are to the 1997 version of the statute unless otherwise noted.

[4]A "surrogate" is defined as "an individual, other than a patient's agent or guardian, authorized under the [Act] to make a health-care decision for the patient[.]" Section 24-7A-1(V) (2009).

Daughter signed the admission agreement. *See id.* ¶ 10. Although Resident's medical records indicate she suffered from "severe cognitive impairment[,]" "severe cognitive functional decline[,]" and "dementia[,]" we see no specific determination in the record that she lacked capacity. *See* § 24-7A-1(C) (2009) (defining "capacity" as "an individual's ability to understand and appreciate the nature and consequences of proposed health care, including its significant benefits, risks and alternatives to proposed health care and to make and communicate an informed health-care decision"). And apart from one medical record signed by a nurse from the Facility, these records do not indicate who prepared them. Accordingly, Daughter did not meet the "statutory condition precedent" to permit her to act as Resident's health-care surrogate under the Act. *See Corum*, 2010-NMCA-105, ¶ 9. We therefore do not reach the question of whether an agreement to arbitrate can be considered a health-care decision. *See id.*

**{21}**    In sum, we conclude Defendants failed to carry their burden of demonstrating a valid arbitration agreement. We therefore do not reach Defendants' remaining arguments. *See Sheraden v. Black*, 1988-NMCA-016, ¶ 10, 107 N.M. 76, 752 P.2d 791 ("It is well settled in New Mexico that the function of a reviewing court on appeal is to correct erroneous results, not to correct errors that, even if corrected, would not change the result."). Accordingly, we concluded the district court properly denied Defendants' motion to compel arbitration.

**CONCLUSION**

**{22}**    For the foregoing reasons, we affirm.

**{23}    IT IS SO ORDERED.**

**KRISTINA BOGARDUS, Judge**

**WE CONCUR:**

**J. MILES HANISEE, Chief Judge**

**JANE B. YOHALEM, Judge**